**MASSACHUSETTS MUTUAL LIFE IN-SURANCE COMPANY, Plaintiff–Counter–Defendant–Appellee,**

v.

**Daniel J. MILLSTEIN, Defendant–Counter–Plaintiff–Appellant.**

**No. 418, Docket 96–7364.**

United States Court of Appeals, Second Circuit.

Argued Dec. 13, 1996.

Decided Oct. 1, 1997.

Donald J. O'Brien, Avon, CT, for Defendant–Counter–Claimant–

Appellant.

David W. Rubin, Stamford, CT (Peter M. Nolin, Hebb & Gitlin, Hartford, CT, on the brief), for Plaintiff–Counter–Defendant–Appellee.

Before: CARDAMONE and PARKER, Circuit Judges, & WEXLER, District Judge.[1]

WEXLER, District Judge:

## BACKGROUND

On September 5, 1990, Millstein, then an attorney practicing in Connecticut, purchased a disability income policy from Massachusetts Mutual. The policy provided benefits if Millstein proved that he had lost earned income due to a disability within the meaning of the policy. Part 1 of the policy defines a "disability" as an incapacity of the Insured, which:

1.  is due to injury or sickness; and

2.  begins while this policy is in force; and

3.  requires care by or at the direction of a legally qualified physician, unless [Massachusetts Mutual] is furnished with proof satisfactory to [it], that future care would be of no use; and

4.  reduces the insured's ability to work; and

5.  causes a loss of earned income, as discussed in this part.

On May 9, 1994 Millstein filed a notice of claim with Massachusetts Mutual alleging that he was suffering from Attention Deficit Disorder ("ADD"), conduct disorder ("CD") and chemical dependency which caused him to suffer a loss of earned income. Massachusetts Mutual made payments to Millstein in the amount of $10,900, representing the benefits ostensibly due for the period from July 6, 1994 through September 5, 1994 while it investigated his claim. Massachusetts Mutual eventually refused to pay Millstein further benefits under the policy and sought a declaratory judgment action in the United States District Court, claiming that Millstein's incapacity predated the coverage period, and that his loss of earned income was not caused by his incapacity.

Millstein's history of illegal substance abuse began when he was 15 years old. He smoked marijuana daily until he was about forty years of age. By the time he was 19 years old, he had used LSD approximately 200 times. By the time he was 22 years old, he also had used cocaine on approximately 200 occasions. In addition, he used muscle relaxers, quaaludes, psychedelic mushrooms, mescaline, illegal barbiturates, seconals, freebase cocaine, opium, speed, and hash. Millstein also admitted to selling drugs during both high school and college. Millstein's abuse of alcohol, fiorinal with codeine and marijuana increased over the years to the point that in 1993 he was ingesting four to six fiorinal with codeine per day, 15 to 20 ounces of alcohol per day and four to five marijuana cigarettes per day.

Millstein sought and received treatment for his "chemical dependency/substance abuse" from Dr. Julia A. Wellin on or about April 7, 1994, which was later determined to be Millstein's "date of disability" under the policy. On May 9, 1994, Millstein filed a Notice of Claim with Massachusetts Mutual pursuant to the terms of the policy. He underwent a twenty-eight day, in-patient rehabilitation program at Riverside Rehabilitation in Minnesota from May 12, 1994 to June 8, 1994.

In May 1995, Millstein was diagnosed for the first time with ADD and/or CD by Dr. Sybil Baran, a psychologist. Dr. Baran believed that Millstein had suffered from these disorders his entire life.

Millstein began practicing as an attorney in 1980 and has specialized in divorce work, commercial litigation, probate work, tax work, corporation formation, and general bankruptcy work. Since Millstein began practicing law, he has been associated with two firms and has practiced on his own. Despite Millstein's drug use, ADD and/or CD, he testified at deposition that he was competent to perform the legal work he was

1.  WEXLER, Leonard D., United States District Judge, sitting by designation.

conducting. Millstein apparently did not claim he was disabled until after he stopped using drugs.

Millstein diverted $200,000 to $300,000 from his employer in 1986 which he admitted to and repaid to avoid criminal prosecution. From 1990 to 1992, Millstein committed fraud by facilitating loans from his clients to a third party to further his own financial interests. Yet again, in 1993 and 1994, Millstein diverted $800,000 of his clients' trust fund accounts to finance personal investments. Millstein acknowledged that this diversion was without his clients' consent, knowledge or approval and that this amounted to a breach of his fiduciary duties. As a result, the Statewide Grievance Committee suspended Millstein's license to practice law in the State of Connecticut on July 6, 1994. Subsequent to his suspension, criminal proceedings were commenced against Millstein for his misuse of client funds, and he was convicted and sentenced to six years in a Connecticut prison.

## DISCUSSION

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted if the pleadings, depositions, interrogatories and affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 106 S.Ct. at 2509–10, 91 L.Ed.2d 202 (1986). In deciding a motion for summary judgment, the district court must draw all reasonable inferences in favor of the party opposing the motion. *Id.* at 255, 106 S.Ct. at 2513. We review a district court's grant of summary judgment de novo. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–88, 106 S.Ct. 1348, 1355–57, 89 L.Ed.2d 538 (1986).

Upon cross motions for summary judgment, the District Court granted Massachusetts Mutual's motion and denied Millstein's motion holding, as a matter of law, that Massachusetts Mutual had no obligation to pay benefits to Millstein because Millstein's loss of earned income was caused by a legal consequence of his behavior (i.e., the loss of his license to practice law) and not a physical or mental disability. Millstein now asserts that the District Court erred with respect to the causation of Millstein's loss of income and that at the very least such an issue was one of fact for a jury. We disagree. The policy requires that Millstein's loss of earned income be caused by a "disability" within the meaning of the policy. Part 1 of the policy defines "disability." That definition requires that the insured's incapacity "causes a loss of earned income."

Millstein argues below, and on appeal, that his loss of earned income resulted from his chemical dependency. He claims that the diagnoses of ADD and/or CD and chemical dependency indicate disabilities that impaired his judgment and caused him to commit the crimes that led to his disbarment. Massachusetts Mutual asserts that Millstein's loss of earned income was due solely to the revocation of his license to practice law, which resulted from his illegal and unethical use of client funds while practicing. The district court agreed with Massachusetts Mutual, relying on a rule stated by other courts which states simply that an insurance company is not liable for a loss of earned income that results from a license suspension or other consequences of the insured's unlawful behavior. *See Massachusetts Mut. Life Ins. Co. v. Ouellette*, 159 Vt. 187, 189, 617 A.2d 132, 134 (1992); *Goomar v. Centennial Life Ins. Co.*, 855 F.Supp. 319, 323 (S.D.Cal. 1994), *aff'd*, 76 F.3d 1059 (9th Cir.1996); *Brumer v. National Life of Vermont*, 874 F.Supp. 60, 64 (E.D.N.Y.1995); *see also* 15 G. Couch, CYCLOPEDIA OF INSURANCE LAW § 53.41 (2d ed.1983).

*Ouellette* involved an optometrist who lost his license to practice optometry after being found guilty of lewd and lascivious behavior with a minor. Dr. Ouellette suffered from atypical paraphilia and primary pedophilia, and claimed he was totally disabled within the meaning of his disability policy. He argued that his illness prevented him from performing his occupational duties because it caused his incarceration. *Ouellette*, 159 Vt. at 188, 617 A.2d at 133. The Vermont Supreme Court, stating that imposing liability would be contrary to the public interest in

discouraging coverage for an insured's own intentional criminal conduct, held that the insured's inability to practice optometry was caused not by his illness but rather by his conviction. *Id.* at 189–91, 617 A.2d at 134.

Similarly, *Goomar* involved a physician whose license to practice medicine was revoked by New York's Regents Review Committee after he sexually molested four female patients. Dr. Goomar alleged that he saw astral beings which caused his reprehensible conduct. Goomar sought disability benefits due to his psychological impairment. *Goomar*, 855 F.Supp. at 320. The Southern District of California rejected Goomar's claims of coverage under the reasoning stated in *Ouellette* and held that the "Plaintiff's inability to practice his regular occupation is due to his license revocation rather than sickness or injury." *Id.* at 326.

In both *Ouellette* and *Goomar*, the courts were influenced greatly by the fact that the insured was not incapable of performing his occupational duties absent the legal restriction placed upon him.

> There is an important difference between an impairment which results in an inability to perform the physical or mental functions necessary to engage in substantial gainful activity on the one hand and antisocial behavior which results in confinement [or license revocation] on the other. In the latter case, it is confinement [or revocation] rather than the impairment which precludes the individual from engaging in substantial gainful activity.

*Ouellette*, 159 Vt. at 190, 617 A.2d at 134 (quoting *Waldron v. Secretary of H.E.W.*, 344 F.Supp. 1176, 1180 (D.Md.1972)). We agree with the reasoning of these courts. While the question of whether a loss of earned income is caused by a disability is often one for the jury, we hold that, as a matter of law, Millstein's loss of earned income was caused by his criminal conduct and the resulting revocation of his license due to his prior felony conviction, and not by a physical inability to perform his occupational duties.

First, the evidence in this case indicates that Millstein had been abusing drugs since he was 15 years old. Although Millstein's medical evidence indicates that his ADD and CD probably date back even earlier than that, notwithstanding these conditions, Millstein graduated from both college and law school, passed the bar examination and practiced law for approximately 15 years. Millstein did not seek treatment until his license to practice law was in jeopardy.

Clearly, for several years, Millstein's conditions did not prevent him from performing the basic tasks needed to maintain a law practice. As noted above, he became proficient in several areas of the law, in spite of the fact that he was constantly using various forms of illegal drugs throughout that time.

Second, according to Millstein's own deposition, he still has the ability to perform legal work, but is only prevented from doing so by the loss of his license. Millstein does not claim that his condition is such that even if his suspension from the practice of law was lifted, he would still be unable to practice law. Notably, Millstein was not punished for his use of drugs but rather because he stole money from his clients. Millstein does not dispute this; however, he claims that his judgment was impaired by his chemical dependency.

The fact that Millstein has shown that his chemical dependency did not prevent him from practicing law in the past and that he admits he could still practice today if he were not suspended, are ample reason to affirm the District Court's conclusion that, as a matter of law, Millstein's loss of earned income was caused by his suspension, *not* his chemical dependency. We find that a rule which would allow a lawyer to steal from his clients, even when such theft occurs in the throes of a drug addiction, and then recover disability benefits for income lost due to the suspension resulting from such theft, would be against public policy.

Such a rule is in keeping with a longstanding line of cases in which state courts have refused to allow an insured to be indemnified from liability resulting from the insured's intentional causation of an injury. *See Allstate Ins. Co. v. Mugavero*, 79 N.Y.2d 153, 161, 589 N.E.2d 365, 369–70, 581 N.Y.S.2d 142, 146–47 (1992)(stating that the ordinary person "would be startled by the notion that

[an insured] should receive insurance protection for sexually molesting [ ] children" and "in effect, be permitted to transfer the responsibility for his deeds onto the shoulders of other policyholders," and holding that the insured was not entitled to indemnification because he intentionally caused the children's injuries); *Public Service Mut. Ins. Co. v. Goldfarb*, 53 N.Y.2d 392, 400, 425 N.E.2d 810, 814, 442 N.Y.S.2d 422, 427 (1981)(holding that a further finding that the insured intended to injure the defendant would preclude any liability for the insurer for indemnification of compensatory or punitive damages). The *Goldfarb* court concluded that allowing indemnity for intentional injuries would "violate the 'fundamental principle that no one shall be permitted to take advantage of his own wrong.'" *Id.* (quoting *Messersmith v. American Fid. Co.*, 232 N.Y. 161, 165, 133 N.E. 432, 433 (1921)).

Along somewhat different lines, the Michigan Supreme Court has refused to read a public policy exception into indemnification obligations under insurance contracts where, unlike the facts here, the result of requiring coverage would benefit the innocent victim rather than the insured (read "wrongdoer"). *Vigilant Ins. Co. v. Kambly*, 114 Mich.App. 683, 687, 319 N.W.2d 382, 384–85 (1982). Similarly, the Connecticut Supreme Court relying upon the policy reasons of both the New York and Michigan courts allowed indemnification of a doctor accused of sexual assault and medical malpractice because indemnification was sought only for the medical malpractice, not the intentional tort of sexual assault, and because the innocent victim would benefit rather than the insured.[2] *St. Paul Fire and Marine Ins. Co. v. Shernow*, 222 Conn. 823, 831–32, 610 A.2d 1281, 1285 (1992). Except for *Kambly*, these cases, including *Ouellette* and *Goomar*, all support the proposition that allowing an insured to benefit from his intentionally injurious conduct is against public policy. In line with these cases, we will not allow Millstein's theft of client funds for self gain to trigger

his disability income policy due to his loss of earned income following his suspension from the practice of law.

### CONCLUSION

Millstein's loss of earned income was not caused by his psychological impairments but by the suspension of his license to practice law. Accordingly, the order of the District Court granting Massachusetts Mutual's summary judgment motion and denying Millstein's cross-motion is hereby AFFIRMED.

---

2. The dissent disagreed with the majority's notion that the indemnification provision does not benefit the insured, but rather benefits the innocent victim. However, since Millstein's case is one for disability insurance rather than liability insurance, there is no question that the only beneficiary of the insurance policy will be Millstein. That is to say that there are no innocent victims in this case who will collect as a result of a finding of coverage.