**Jeffrey E. WEISSMAN, Plaintiff,**

v.

**FIRST UNUM LIFE INSURANCE COMPANY, Defendant.**

**No. 98 Civ. 2458(CLB).**

United States District Court,
S.D. New York.

April 1, 1999.

Eric B. Levine, Wolf, Haldenstein, Adler, Freeman & Herz, New York City, for Plaintiff.

Christopher R. Belmonte, Satterlee Stephens Burke & Burke LLP, Eric B. Levine, Wolf Haldenstein, Alder, Freeman & Herz, New York City, for Defendant.

## FINDINGS OF FACT & CONCLUSIONS OF LAW

BRIEANT, District Judge.

This ERISA case was tried to the Court without a jury on January 26, 1999, at which time the Court reserved decision. The Court sets forth below its Findings of Fact and Conclusions of Law following the trial.

## FACTUAL BACKGROUND

*The Parties*

Plaintiff Jeffrey Weissman is a severely disabled, brain damaged person. His disability is the result of a devastating injury received in a motorcycle accident approximately six years ago. Before the accident,

Mr. Weissman was a securities broker with A.R. Baron & Co., Inc. ("Baron") and before that a broker with D.H. Blair.

Defendant First UNUM Life Insurance Company ("First UNUM") is an insurance company that issued disability policy number 456138 to Baron (the "Policy") under an employee disability plan governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"). First UNUM is also the plan administrator. Mr. Weissman, as an employee of Baron, was listed as covered by the Policy at the time of his accident.

*The Pleadings*

Mr. Weissman seeks review pursuant to 29 U.S.C. § 1132 of a termination of disability benefits being paid by First UNUM, the plan administrator and disability insurer. Plaintiff asks this Court to set aside the decision of First UNUM as plan administrator, and plaintiff seeks money damages for nonpayment of benefits from First UNUM as disability insurer. First UNUM requests that the Court uphold the decision to deny benefits and by counterclaim seeks damages in the amount of all benefits paid to plaintiff under the Policy.

*Issuance of the Policy and Payment of Benefits*

Baron applied to First UNUM for a comprehensive group insurance policy in March of 1993. The written application reported Weissman, along with others, as an employee eligible for benefits under the Policy and reported his annual income as two million dollars. First UNUM issued the Policy effective May 1, 1993. The Policy provided that if an insured became totally disabled within the meaning of the Policy, the insurance company would pay monthly benefits equal to the lesser of 60% of the insured's basic monthly earnings or the amount of the maximum monthly benefit shown in the policy specifications.

On August 21, 1993, Mr. Weissman was in a motorcycle accident that left him severely disabled from brain damage. Mr.

Weissman submitted a Long Term Disability Claim (the "Claim"), dated October 10, 1993, asserting that he was totally disabled. First UNUM accepted Mr. Weissman's Claim and after the Policy's 90–day waiting period elapsed, began paying monthly benefits to Mr. Weissman in the amount of the maximum monthly benefit shown in the policy specifications, i.e., $35,000. First UNUM continued to pay full monthly benefits to Mr. Weissman until March 24, 1998, at which time the total paid under the Policy was $2,011,600.

*First UNUM's Investigation and Quasi–Administrative Decision*

First UNUM became aware of the possibility that the amounts Weissman and Baron had reported as income in the Policy application were obtained by Weissman through illegal or fraudulent means sometime in April 1997, when it received a Forbes magazine article about Baron. First UNUM then began gathering information regarding Baron and Mr. Weissman as part of an investigation into the validity of Mr. Weissman's disability Claim. At the end of the investigation, First UNUM had compiled the following information:

In May 1997, the New York District Attorney's Office filed in New York Supreme Court, New York County, an indictment against Baron and 13 individual defendants, all of whom were former employees of Baron (the "Baron Indictment"). Mr. Weissman was not included or even mentioned in the Baron Indictment or any other indictment. On December 17, 1997, the SIPC Trustee for Baron (the "Baron Trustee") pled the corporation guilty to one count of the indictment, charging that Baron was a criminal enterprise. At the plea allocution, the Baron Trustee, who had no direct knowledge, did not mention Mr. Weissman and stated that "not all employees of A.R. Baron engaged in or assisted in the fraudulent activities of [the codefendants]." Twelve of the thirteen individual defendants pled guilty and one was convicted after trial.

A First UNUM investigator wrote an e-mail indicating that he had spoken with an unidentified New York County "District Attorney," probably not the actual District Attorney, Mr. Morgenthau, but likely an Assistant District Attorney ("ADA"). The ADA told him that all of Baron's assets were obtained by fraud and that Baron was formed to "line the pockets of its executives and employees at the expense of unsuspecting members of the investing public." The e-mail also states, without identifying the source, that Mr. Weissman would have been indicted but for his medical problems.

Trial testimony in the state court of a former Baron employee, Mr. Orkin, indicates that Mr. Orkin was taught fraudulent sales practices by his superiors, including Mr. Weissman, while employed at D.H. Blair. According to Mr. Orkin's testimony, Mr. Weissman was responsible at Baron for supervising and training employees in sales and corporate finance, handling certain relationships with clearing firms, and actual sales. The testimony does not include any specific bad acts by Mr. Weissman or any description of Mr. Weissman's general conduct at Baron. First UNUM also interviewed a representative of the Baron Trustee. That representative stated that Mr. Weissman came from D.H. Blair, a legitimate concern; that 90 percent of Baron's illegal activities occurred in 1994 and 1995, long after Mr. Weissman became disabled; and that "many of the daily transactions [at Baron] were routine brokerage transactions."

Mr. Weissman signed a consent order with the SEC on September 9, 1996 (the "Consent Order") in which he neither admitted nor denied the SEC's findings:

> In anticipation of the institution of these administrative proceedings, the respondents [including Mr. Weissman] have submitted Offers of Settlement ("Offers") to the Commission, which the Commission has determined to accept.

Solely for the purpose of these proceedings and any other proceeding brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings contained herein, the Respondents, by their Offers, consent to the findings and the imposition of the remedial sanctions set forth below.

SEC Consent Order, *In the Matter of Jeffrey Weissman and Martin Weissman,* Admin.Proc. No. 3–9072S, 1996 WL 508775 (SEC Sept. 9, 1996). The SEC contended that through stock manipulations, Mr. Weissman violated, and aided and abetted the violation of, several federal securities laws. The only specific findings of misconduct in the Consent Order are that Mr. Weissman manipulated the common stock of Health Professionals, Inc. ("HPI") during three periods, (1) October 28 to November 12, 1991, while at D.H. Blair; (2) January 27 through February 12, 1992, while at D.H. Blair; and (3) May 24 through June 25, 1993, while at Baron. The Consent Order provides that Mr. Weissman is permanently barred from associating with any broker, dealer, investment company, investment advisor or municipal securities dealer, that he must disgorge $350,000 in illegal profits, and that he must pay a civil penalty of $100,000.

A medical expert reviewed Mr. Weissman's file. As a result, First UNUM did not and does not contest that Mr. Weissman was and remains totally disabled since the August 21, 1993 accident.

Based only on the foregoing information, the First UNUM claims department sent a First UNUM underwriter, Joe Braz, a request to determine whether the Policy would have been issued if First UNUM had known at the time of issuance that Baron's and its employees' income was obtained through fraud. The underwriter determined that First UNUM would not cover any income obtained through illegal means.

First UNUM thereafter decided, without a hearing, to terminate payment of further disability benefits to Mr. Weissman and sent a letter on March 24, 1998 informing Mr. Weissman that it was terminating payment of his disability benefits on the grounds that (1) it would not have issued the Policy to Baron if it had known Baron was a criminal enterprise engaged in illegal activities for profit; (2) Weissman had no "basic monthly earnings" under the Policy because "regular earnings" under the Policy do not include earnings from illegal activities; (3) Weissman could not be found to be in the "active employment" of Baron under the Policy because "active employment" under the Policy does not include employment in an illegal or criminal enterprise; (4) Weissman was rendered permanently and legally disabled from his occupation by the SEC's decision and order barring him from associating with any broker, dealer, investment company, investment advisor or municipal securities dealer. The letter also informed Mr. Weissman of his right to appeal the denial to the LTD Quality Review Section of First UNUM.

On April 7, 1998, Mr. Weissman filed in this Court a complaint and order to show cause for a preliminary injunction restraining First UNUM from withholding his monthly disability benefits under the Policy and for an order expediting review of his Claim. After a hearing before this Court on April 13, 1998, First UNUM agreed in the interests of justice to expedite review of Mr. Weissman's Claim and to pay reduced monthly benefits of $22,000 pending the outcome of this case. At the hearing, the Court determined that these payments would barely cover Mr. Weissman's basic needs and medical care.

First UNUM expedited its review of Mr. Weissman's Claim. Mr. Donald Jensen, manager of quality review and a member of the quality review unit that handles claims currently in litigation, reviewed Mr. Weissman's Claim, with the advice of attorney John LaBosco, counsel for defendant in this case. On April 23, 1998, Mr. Jensen informed Mr. Weissman by letter

that First UNUM was upholding its March 24 decision to deny the Claim. The letter also invited Mr. Weissman to submit any additional information or documentation he deemed relevant. Mr. Weissman did not submit anything.

Pre-trial discovery in this case then commenced. Discovery encompassed both the merits of Mr. Weissman's Claim and the potential conflict of interest created by First UNUM being both the insurer and the supposedly neutral judge of the merits of Mr. Weissman's Claim. Based on this pre-trial discovery, First UNUM created a supplemental record including Mr. Weissman's commission records. The commission records show that most of Mr. Weissman's commissions while at Baron were derived from sales of the securities of HPI, Cypros Pharmaceuticals Corp. ("CYPROS"), Cyro Medical Sciences, Inc. ("CMSI") and Innovir Laboratories, Inc. ("INNOVIR"), the stocks that the Baron Indictment identified as manipulated by other Baron employees. First UNUM informed Mr. Weissman of the supplemental information and invited him to respond. Mr. Weissman declined the invitation.

*The Policy*

To be eligible for benefits under the Policy, a Baron employee had to engage in "active employment," which is defined as working:

1. for the employer on a full-time basis and paid regular earnings (temporary or seasonal employees are excluded);

2. at least the minimum number of hours shown in the policy specifications; and either

3. at the employer's usual place of business; or

4. at a location to which the employer's business requires the employee to travel.

When First UNUM "receives proof that an insured is disabled due to sickness or injury and requires the regular attendance of a physician, the [Insurance] Company will pay the insured a monthly benefit. . . . The benefit will be paid for the period of disability if the insured gives to the [Insurance] Company proof of continued . . . disability and . . . regular attendance of a physician." The amount of coverage is defined as the lesser of the maximum monthly benefit or 60 percent of the employee's "Basic monthly earnings." Basic monthly earnings are defined in the Policy as

the insured's average monthly earnings as figured:

a. from the W–2 form (from the box that reflects wages, tips and other compensation excluding bonuses) received from the employer for the calendar year just prior to the date disability begins; or

b. For the period of employment if no W–2 was received.

### DISCUSSION

*Standard of Review*

Plaintiff's claim for review of First UNUM's denial of benefits under a group employee disability insurance policy is governed by ERISA. A denial of benefits under ERISA "is to be reviewed under a *de novo* standard, unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), in which case the reviewing court generally applies an arbitrary and capricious standard of review. Under the arbitrary and capricious standard, any conflict of interest to which the administrator is subject "must be weighed as a '[f]actor in determining whether there is an abuse of discretion.'" *Id.* at 115, 109 S.Ct. 948. If, however, "the court finds that the administrator was in fact influenced by the conflict of interest, the deference otherwise accorded the administrator's decision drops away and the court interprets the plan *de novo.*" *Sullivan v.*

*LTV Aerospace and Defense Co.,* 82 F.3d 1251, 1256 (2d Cir.1996).

In this case, it is undisputed that the Policy gives First UNUM discretionary authority. First UNUM is also clearly subject to a conflict of interest. Presented with Mr. Weissman's Claim, First UNUM was "faced with the conflict of interest inherent to an insurer acting as plan administrator and was particularly conflicted because of the prospect of an unusually expensive benefit." *See Whitney v. Empire Blue Cross and Blue Shield,* 920 F.Supp. 477, 484 (S.D.N.Y.1996) (Sweet, J.). In order to receive the benefit of a less deferential review, plaintiff must prove not only that a conflict of interest exists, but also that this conflict of interest in fact influenced First UNUM's decision to deny benefits. *Whitney v. Empire Blue Cross and Blue Shield,* 106 F.3d 475, 477 (2d Cir.1997). Proof that the plan administrator must pay the claim out of its own assets and that the benefit payments are unusually high is insufficient to show that the conflict of interest in fact influenced the administrator's decision. *Id.*

Plaintiff fails to meet this burden. Plaintiff asserts that in addition to First UNUM's financial interest in denying the claim, the initial decisionmaking process and the appeals process were unfair and biased because (1) the same person who ultimately decided the claim also participated in pre-litigation settlement discussions and (2) the appeal went to the litigation·support group instead of the regular appeals group. These facts alone do not support the inference that the decisionmakers at First UNUM in fact were influenced by a conflict of interest. Participation in settlement discussions does not prevent a judge from being neutral, even if the settlement discussions involve consideration of the financial interest of the administrator. In addition, plaintiff's Claim followed the normal course of review for complex cases that are currently in litigation. Plaintiff's Claim was assigned to the complex case section for initial review be-

cause it is a complex case. It was then assigned to Mr. Jensen, a quality review manager and a member of the quality review unit that handles claims currently in litigation, because it was in litigation. Because the information in the record implicated legal issues, Mr. Jensen requested advice regarding those legal issues from the attorney representing the defendant in the litigation. This does not necessarily mean that Mr. Jensen was somehow influenced by the additional conflict of interest created by First UNUM's interest in resolving the litigation in its favor because First UNUM's interest in resolving the litigation short of trial was no different from its interest in resolving plaintiff's disability Claim in a fair and impartial manner.

Furthermore, the decisionmakers in this case, Joseph Braz and Donald Jensen, testified that they were not influenced by the financial or litigation interests of First UNUM. They testified that they have handled larger claims before and that it is their job to remain neutral. Their reputations and the reputation of the company depend on it. Mr. Braz testified:

> As a claims professional who has been in the business for 20 years and ha[s] worked for several companies and who has a reputation in the industry and who is known in the industry, I have no vested interest in the outcome of a claim. I don't care how big or how small it is.... [I]t had no bearing whatsoever, the fact that this is a large claim. There was no evaluation of what effect this might have on First UNUM. It's one claim of 60 thousand claims that UNUM has.... I have no interest in doing anything other than making a proper decision on a claim.

Mr. Jensen testified:

> Q. Do you have any incentive within the quality review to deny claims in order to improve the finances of the company?
>
> A. None whatsoever.

Q. Why not?

A. It just doesn't affect us. We are in there to make and we are pressured to do a proper decision, and that's all we have been asked and required to do.... You want to make the right call and that's what we are told to do.

The Court sees no reason to disbelieve these witnesses and concludes that plaintiff has failed to prove that First UNUM's decision to deny benefits was in fact influenced by the conflict of interest.

■ The Court thus will review the decision under the arbitrary and capricious standard and will consider First UNUM's conflict of interest simply as an additional factor in determining whether the decision to deny benefits was an abuse of discretion. This Court's "review under the arbitrary and capricious standard is limited to the administrative record." *Miller v. United Welfare Fund*, 72 F.3d 1066, 1071 (2d Cir.1995).[1] Under this standard, the Court may overturn First UNUM's decision to deny benefits if the decision was "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir.1995).

*First UNUM's Decision Was Arbitrary and Capricious*

First UNUM's decision to deny benefits to Mr. Weissman was arbitrary and capricious because: (1) the interpretation of the Policy as excluding illegal income of the sort charged here is an unreasonable interpretation; (2) the exclusion from the Policy of illegal income based on non-existent, unrecognized public policy is erroneous as a matter of law; (3) the determination that a subsequent legal disability cuts off the insurer's liability under the Policy arising out of the prior medical disability is erroneous as a matter of law; and because (4) the determination that a material amount

of Mr. Weissman's income was illegal is unsupported by substantial evidence.

■ First UNUM's interpretation of the Policy terms "Basic monthly earnings" to mean legal earnings, and "regular earnings" to mean legal earnings is unreasonable. The plain language of the Policy supports the opposite conclusion. The Policy defines "Basic monthly earnings" as derived from the W–2 form, which as a matter of law includes income derived from illegal activities. *See* IRS Revenue Ruling 60–77 ("[A]n individual performing services in an illegal activity is to be considered an employee for Federal Employment tax purposes and for purposes of withholding of income tax at source on wages."). The Policy defines "Active employment" in relevant part as "working for the employer on a full-time basis and paid regular earnings (temporary or seasonal employees are excluded)." Mr. Weissman worked on a full-time basis and was paid earnings on a set schedule. In addition, the language in parentheses further defines "on a full-time basis" and "paid regular earnings" as intended to exclude temporary or seasonal employees, not employees earning income from illegal activities.

Looking beyond the plain language of the Policy, there is no objective evidence in the record that First UNUM intended its proffered interpretation of this language when the Policy was sold. As plaintiff points out, there is no evidence of any history of First UNUM investigating source of income or earnings before issuing a policy, any history of First UNUM applying similar language in this way, or any internal release or internal reference to this interpretation of the language before plaintiff's claim. First UNUM's reliance on its own after-the-fact policy considerations to interpret the meaning of the language is unreasonable. First UNUM

---

1. The Court rejects First UNUM's argument to the contrary. The argument is based on citation to *Zisel v. Prudential Ins. Co. of America*, 845 F.Supp. 949, 952 (E.D.N.Y.1994), a case decided by the United States District Court for the Eastern District of New York one year before *Miller*.

was quite capable of expressly excluding income received by illegal means; First UNUM wrote the Policy and neither Baron nor Mr. Weissman had any opportunity to negotiate the terms. This Policy was issued to an employer in a highly regulated industry, in which some business practices are criminalized by statute or regulations without the necessity of proving a *mens rea. See, e.g.,* Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); *United States v. O'Hagan,* 521 U.S. 642, 117 S.Ct. 2199, 2206, 138 L.Ed.2d 724 (1997) (criminal liability under § 10(b) of Securities Exchange Act may be predicated on misappropriation theory).

■ First UNUM also relies on the well-established public policy against indemnifying a wrongdoer for his own wrongful act. First UNUM confuses the indemnification of a wrongdoer from loss caused by the wrongdoer's intentional misconduct with the payment of medical disability benefits as compensation for lost earnings derived from illegal activities. The public policy behind voiding any contract provision that indemnifies a wrongdoer from paying the price for his wrongful conduct is to avoid encouraging the wrongful conduct by removing the risk of loss. In that case, the wrongful conduct causes the loss to the wrongdoer. In this case, however, the alleged wrongful conduct did not cause the loss; plaintiff's injury and resulting brain damage caused the loss. It is absurd to suggest that including coverage for loss of illegal income would encourage anyone, including the plaintiff, intentionally to cause himself brain damage or encourage anyone to commit fraud in order to boost his earnings and thereby increase the benefits he would receive in the remote event of suffering a traumatic brain injury.

This distinction is supported by the opinion of Our Court of Appeals in *Massachusetts Mutual Life Ins. Co. v. Millstein,* 129 F.3d 688 (2d Cir.1997). In *Millstein,* an attorney's chemical dependency (alcoholism) caused him to defraud his clients and that misconduct caused his license to be suspended. Relying on "a longstanding line of cases in which state courts have refused to allow an insured to be indemnified from liability resulting from the insured's intentional causation of an injury," *id.* at 691, the court held that it would be against public policy to "allow a lawyer to steal from his clients ... and then recover disability benefits for income lost *due to the suspension resulting from such theft.*" *Id.* (emphasis added). The court specifically stated that the insured's "loss of earned income was caused by his suspension, *not* his chemical dependency." *Id.* (emphasis in original). Our Court of appeals distinguished indemnification for lost earnings caused by wrongdoing from compensation for loss caused by a medical disability:

> 'There is an important difference between an impairment which results in an inability to perform the physical or mental functions necessary to engage in substantial gainful activity on the one hand and antisocial behavior which results in confinement [or license revocation] on the other. In the latter case, it is confinement or license revocation rather than the impairment which precludes the individual from engaging in substantial gainful activity.'

*Id.* at 691 (quoting *Massachusetts Mutual Life Ins. Co. v. Ouellette,* 159 Vt. 187, 190, 617 A.2d 132 (1992)) (alterations in original).

The Court has found no federal or state cases that recognize a public policy against providing disability benefits as compensation for a bona fide medical disability that prevents a person from working where the benefit calculation is based on both legal and illegal earnings. In fact, New York courts have interpreted disability insurance policies as providing for compensation for disability rather than indemnity for lost earnings. *See Baum v. The Equitable Life Assurance Society,* 148 Misc. 322, 265 N.Y.S. 786 (App.Div.1st Dept.1933); *Suttles v. Railway Mail Assoc.,* 156 A.D. 435,

141 N.Y.S. 1024 (App.Div.4th Dept.1913). It was unreasonable for First UNUM to rely on non-existent, and unpublished considerations of "public policy" that were unknown to either party at the time of contracting.

Furthermore, there are considerations of public policy beyond the underlying facts of this case. Insurance is a means of spreading the risk of sudden, random accidents. The cost of premiums are computed by skilled actuaries who figure the likelihood of insureds such as Weissman getting hurt playing with their toys, or of trees stepping out onto the highway in front of insureds' Jaguars, together with the need for reasonable profit, and thereby set the policy premium. These premiums do not account for the possibility that the insured may be employed in a concern that may violate a statute regulating the conduct of its business affairs. Thus, when an otherwise legitimate indemnification or compensation can be reduced based on this type of violation, the insurer gains a windfall based on an event never considered by the actuaries, and is no longer spreading the risk of sudden, random accidents. If the insurer were allowed to reduce payments on this basis, where would it end? Would a claim for disability benefits by an injured grocery store executive be reduced because the store sold adulterated food or conspired to fix prices in violation of the Antitrust Laws? In these situations, disqualification of the claimant was not contemplated when the insurer sold the plan and the insurer should not be allowed to receive a windfall.

■ First UNUM's determination that a subsequent legal disability cuts off its liability under the Policy arising out of the prior medical disability is erroneous as a matter of law. See Paul Revere Life Ins. Co. v. Bavaro, 957 F.Supp. 444 (S.D.N.Y. 1997) (Scheindlin, J.). The relevant facts in Paul Revere are strikingly similar to the facts in this case and this Court agrees with the court's analysis in Paul Revere.

There, as in this case, the disability policy defined total disability as meaning "because of Injury or Sickness ... [the insured is] unable to perform the important duties of [his] Occupation; and ... [the insured is] under the regular and personal care of a Physician." Eligibility for benefits depended on the insured's establishing "that he cannot work because of his sickness." Id. at 448. In addition, the policy in Paul Revere "ha[d] no exclusion for disability arising from the commission of or participation in a felony [and was] silent with respect to concurrent causes resulting in an inability to work ... [and with respect to] the chronology of events if there is more than one cause of disability." Id. Thus, the triggering event for payment of disability benefits was a medical disability.

In Paul Revere, as in this case, the insured became medically disabled and could not work so the insurer began making disability payments. The insured subsequently was convicted of wire fraud based on unlawful conduct that had occurred before he became medically disabled and in the course of his occupation as an insurance broker. As a result of such conviction, he lost his license. The insurance company argued that the insured's subsequent legal disability based on conduct that occurred before his medical disability terminated the insurance company's liability for disability benefits because the medical disability was no longer the cause of the insured's inability to work. Id. at 447. The court held that an insured's subsequent legal disability is irrelevant to the insured's eligibility for disability benefits where the trigger for payment of the disability benefits is a medical disability. Id. at 449. First UNUM argues that Our Court of Appeals held differently in Millstein, but this Court's reading of Millstein actually supports this conclusion. As noted above, Millstein specifically distinguishes cases where the wrongdoing causes the loss of earnings from cases where a medical disability

causes the loss of earnings. *See Millstein*, 129 F.3d at 691.

This Court agrees with the analysis of the court in *Paul Revere*. Plaintiff's agreement in the SEC Consent Order to be barred from his occupation is a subsequent legal disability that is irrelevant to his continued eligibility for disability benefits. Thus, First UNUM's decision to deny Mr. Weissman disability benefits based on its determination that the Policy excludes illegal earnings or based on a subsequent legal disability was arbitrary and capricious.

Alternatively, First UNUM's decision to deny benefits was arbitrary and capricious because its determination that a material amount of Mr. Weissman's earnings came from illegal activities is not supported by substantial evidence. First UNUM relied only on the information in the record, much of which is uncorroborated hearsay, and the record does not supply substantial evidence that a material amount of Mr. Weissman's earnings came from illegal activities.

The Baron Indictment is of no probative value in determining whether Mr. Weissman was engaged in unlawful activities. The Baron Indictment does not name or even mention Mr. Weissman and it covers six years, five of which are after Mr. Weissman was hurt. In addition, the Baron Trustee pled the corporation guilty to only one count of the Baron Indictment and decided to do so solely to save money in the interests of Baron's customers and creditors, not in the interests of Baron, which was defunct, or its employees. The plea allocution did not mention Mr. Weissman and did not address his activities or source of earnings. In fact, the Baron Trustee stated in an interview by First UNUM that "many of the daily transactions [of Baron] were routine brokerage transactions."

Most of the statements by the unidentified ADA are irrelevant as they refer only to Baron as an entity. The one comment referring to Mr. Weissman, that the only reason he was not indicted was his medical condition, has very little probative value because it is simply the opinion of a prosecutor who had no personal knowledge of Mr. Weissman's alleged misconduct, and was most presumptuous in undertaking to predict what a properly instructed grand jury would do. First UNUM never attempted to obtain any evidence upon which the ADA may have been relying in making such a comment. First UNUM therefore may not assume that such evidence exits.

The testimony of Mr. Orkin is of very little value. His testimony focuses on other Baron employees, hardly mentioning Mr. Weissman. His evidence regarding Mr. Weissman amounts to testimony that Mr. Weissman did some illegal trades and taught him how to achieve "no net sales" *while at D.H. Blair*, and that Mr. Weissman was his "boss" and trained him in sales once Mr. Weissman came over to Baron from D.H. Blair. Mr. Weissman's activities at D.H. Blair are not relevant to his activities at Baron. Mr. Orkin provides no testimony regarding any specific bad acts of Mr. Weissman or regarding the general conduct of Mr. Weissman at Baron.

First UNUM relies heavily on the SEC Consent Order signed by Mr. Weissman after he became disabled. In that Consent Order, Mr. Weissman expressly declined to admit the SEC's findings, and is not bound by them. But Mr. Weissman did consent to entry of those findings and payment of penalties based on those findings. As such, First UNUM was entitled to rely on those findings as some evidence of Mr. Weissman's conduct. At the same time, First UNUM had the obligation to consider that the cost of defending an SEC proceeding would be far more than the amount paid under the Consent Order, and that when Mr. Weissman signed the Consent Order, he was subject to the overwhelming litigating power of the SEC, he had no expectation of ever returning to the securities industry in light of his medical

disability, and he was not truly mentally competent. Mr. Weissman's deposition testimony confirms this:

Q: Do you have any recollection, sir, of consenting to this order?

A: What do you mean by "consenting"? What do you mean? . . .

Q: Did you ever submit an Offer of Settlement to the SEC? . . .

A: I don't know. . . .

Q: . . . . Did you ever settle with the SEC?

A: Yes, I did.

Q: What is your understanding of the terms upon which you settled with the SEC?

A: My understanding is that I settled without admitting or denying any guilt so that I could move on with my recovery from my coma. That's what I remember.

Q: The Order itself recites that you were consenting to the findings. . . .

A: I don't know how to answer that. I don't know how the document reads. I don't know. I don't know what I would be consenting to.

Deposition of Jeffrey Weissman at 67–68.

Assuming it was proper, in light of all of the above considerations, for First Unum to rely on the SEC findings, First UNUM was not entitled to rely on those limited findings to conclude that all, or even a material part, of Mr. Weissman's earnings were illegal earnings. The findings of the SEC are extremely limited in scope. The only relevant finding by the SEC relates to Mr. Weissman's manipulation of the stock of HPI during a one month period while Mr. Weissman was at Baron. Assuming the entire $350,000 disgorged by Mr. Weissman related to illegal profits during that month and First UNUM reduced Mr. Weissman's average monthly earnings accordingly, his benefits would not have changed in light of his other earnings. Thus, this amount of illegal earnings was immaterial to First UNUM's decision to deny benefits.

First UNUM's determination that all or most of plaintiff's earnings at Baron were illegal earnings is not supported by substantial evidence on this record. Therefore, the decision to deny benefits was arbitrary and capricious.

Our Court of Appeals has held that "if upon review a district court concludes that the [administrator's] decision was arbitrary and capricious [because it was not supported by substantial evidence], it must remand to the [administrator] with instructions to consider additional evidence unless no new evidence could produce a reasonable conclusion permitting denial of the claim or remand would otherwise be a 'useless formality.' " *Miller*, 72 F.3d at 1071. Here, the Court concludes that remand would be a useless formality for two reasons. First, the decision is incorrect as a matter of law. Second, discovery in this case was comprehensive and the additional evidence adduced from discovery still does not provide the substantial evidence required to deny Mr. Weissman his disability benefits. The additional evidence adduced in discovery was presented to the Court during trial as the Supplemental Record. The Court considered the Supplemental Record on the issue of whether to remand. The evidence of commissions earned by Mr. Weissman from sales of stock allegedly manipulated by other Baron employees is irrelevant. Based on the SEC Consent Order, the only reliable evidence of illegal activity on the part of Mr. Weissman, the only commissions earned by Mr. Weissman that are relevant to First UNUM's determination are the commissions earned from the sale of HPI stock during the time that the SEC found Mr. Weissman was manipulating that stock while at Baron, i.e., May 24 through June 25, 1993. These commissions amount to $181,197.38. Assuming it would be proper to exclude that amount from Mr. Weissman's earnings for the year, the exclusion would not affect the disability payments because 60 percent of Mr. Weissman's newly calculated average

monthly income would still be well above the maximum monthly benefits available.

## ORDER

The foregoing constitutes the Court's Findings of Fact and Conclusions of Law. All contentions and arguments presented but not specifically referred to shall be deemed to have been considered and rejected. For the foregoing reasons, the Court reverses First UNUM's decision to terminate Mr. Weissman's disability benefits and finds in favor of the plaintiff on his claim for continuation of his disability benefits and for money damages in the amount of the difference between the maximum monthly benefits and the amount First UNUM has been paying *pendente lite,* together with prejudgment interest from the due dates to the date of the Judgement. Counsel shall submit a final judgment with waiver of notice of settlement, or shall settle a judgment on five (5) days' notice. Such proposed judgment shall be in the hands of the Court for signature no later than April 30, 1999.

SO ORDERED.