OPINION OF THE COURT
Balkin, J.
The plaintiff, Brad J. Jacobs, was a plastic surgeon. In June 2007 his medical license was suspended by New York State's Commissioner of Health on the ground that his continued practice “constituted an imminent danger to the health of the people of this state.” A few months later, the plaintiff filed claims under his disability insurance policies. He asserted that even before the State suspended his license, mental illness and drug addiction had rendered him unable to perform his duties “with any degree of safety or competence.” The plaintiff's insurer, the defendant Northwestern Mutual Life Insurance Company (hereinafter Northwestern), denied his claims on the ground that the plaintiff had been practicing his profession until the very day his license was suspended. The principal issue on this appeal and cross appeal is whether, under the terms of the plaintiffs disability insurance policies, his inability to practice his profession resulted from a “sickness,” which may be covered under the policy, or from the loss of his medical license, which would not be covered.
*80 I
The plaintiff had a successful medical practice located on the Upper East Side of Manhattan. He was insured under nine disability insurance policies issued by Northwestern, which provided for benefits in the event the plaintiff became disabled.
In 2001 the plaintiff began using crystal methamphetamine (hereinafter crystal meth), at first once a week, but increasing to daily use. In March 2003 he began therapy with a drug counselor, but relapsed after a short period of abstinence. Evidence adduced during discovery established that, from 2001 to June 2007, the plaintiff was making reckless treatment decisions. It also established that so many malpractice lawsuits had been filed against him that, by 2007, he did not have malpractice insurance because he could not afford the premiums.
In the first six months of 2007, the plaintiff consulted with patients on Mondays and Wednesdays, from 9:00 a.m. to 5:00 p.m., and performed surgery on Tuesdays, Thursdays, and Fridays, from approximately 7:00 a.m. to 5:00 p.m. He testified at his deposition, however, that during those six months he was sleeping little and was “in a fog” because he was ingesting crystal meth several times a week. He was also self-medicating with Xanax and Fentanyl. Crystal meth gave the plaintiff a “high” that replicated the high he felt during his bipolar upswings. The plaintiff continued using crystal meth because he believed that, without it, he would “crash” and be unable to function.
On June 18, 2007, the New York State Board for Professional Medical Conduct (hereinafter the Board) notified the plaintiff that his license to practice medicine was being suspended because his continued practice “constitute [d] an imminent danger to the health of the people of this state.” The statement of charges iterated alleged acts of negligence, incompetence, performance of services not authorized by patients, failure to maintain records and moral unfitness. The charges pertained to 10 incidents that took place between 2001 and 2005.
In August 2007, about two months after his license was suspended, the plaintiff consulted with a psychologist, who, upon diagnosing him as suffering from bipolar II disorder, referred him to a psychiatrist.
On September 12, 2007, following 11 days of hearings before the Board, the plaintiff agreed to surrender his medical license, because he could not “successfully defend against acts of *81 misconduct alleged in the statement of charges.” The next day, the Board accepted the plaintiffs surrender of his license.
In October 2007 the plaintiff was admitted to an inpatient treatment program. He remained in the program and was treated for bipolar II disorder, as well as impulse control disorder and amphetamine dependence, until January 26, 2008.
In January 2008 the plaintiff sought benefits under the “total disability” provisions of his disability insurance policies. According to his “Request for Disability Benefits,” he “did not perform any job duties and [was] claiming total disability benefits” for the period from June 18, 2007—the date his license was suspended—to “present.” The plaintiff claimed that he suffered from various conditions, including bipolar II disorder. In April 2008 Northwestern denied the plaintiffs claim on the ground that the plaintiff had ceased practicing medicine because his license was suspended, not because he was unable to perform the principal duties of his occupation. Later, Northwestern denied the plaintiffs appeal of its decision. The letter informing the plaintiff of the result of the appeal noted among other things that, “[although he may have had a condition prior to June 18, 2007, it was not that condition that caused him to stop working but rather the suspension of his license,” and that nothing in the plaintiffs file “suggested], let alone prove[d] that [the plaintiff] was unable to perform the principal duties of his occupation on a full time basis due to accident or sickness prior to or as of the day his license was suspended.”
In December 2008, while his appeal of the denial of benefits was pending, the plaintiff commenced this action against Northwestern seeking damages for breach of contract and unjust enrichment. After discovery was completed, Northwestern moved for summary judgment dismissing the amended complaint. Northwestern acknowledged that the plaintiff was unable to practice medicine as of June 18, 2007, but argued that his “disability” resulted from the suspension of his license, not from his medical or psychological condition. The plaintiff opposed Northwestern’s motion and cross-moved for summary judgment on the amended complaint. The Supreme Court denied the motion and the cross motion, finding that there were triable issues of fact as to whether the plaintiffs bipolar disorder preceded the suspension of his medical license and whether it impeded his ability to carry out his responsibilities as a plastic surgeon. Both parties appeal.
*82 II
Unambiguous provisions of an insurance policy, like unambiguous provisions in any other contract, are accorded “their plain and ordinary meaning” (White v Continental Cas. Co., 9 NY3d 264, 267 [2007], citing Teichman v Community Hosp. of W. Suffolk, 87 NY2d 514, 520 [1996]; see Antoine v City of New York, 56 AD3d 583, 584 [2008]). Here, the plaintiffs disability insurance policies provide that, in order to qualify for disability benefits, the plaintiff is required to establish that he is totally disabled and no longer able to perform the functions of the profession in which he was engaged when his illness or injury began. Eight of the plaintiffs nine policies are identical in these terms, and they define “totally disabled” as being “unable to perform the principal duties of the regular occupation.” As relevant here, “regular occupation” is defined as “the occupation of the Insured at the time the Insured becomes disabled.” These eight policies—the ninth is not significantly different—also provide that benefits are to be paid for the insured’s total or partial disability only if:
“the Insured becomes disabled while this policy is in force;
“the Insured is under the Regular Care of a Licensed Physician during disability;
“the disability results from an accident or sickness; and
“the disability is not excluded under Section 3.”*
It is not disputed that the plaintiffs disability, whatever its nature, arose while the policies were in force. Moreover, the plaintiff was under the regular care of a physician beginning no later than August 2007, two months after the date from which he seeks benefits. Indeed, Northwestern does not even dispute that, at some point after the plaintiffs license was suspended, his mental or psychological condition rendered him “unable to perform the principal duties of’ a plastic surgeon. The crux of this case is whether, under the meaning of the policies, the plaintiffs disability “resulted] from an accident or sickness.”
*83 III
The general rule, followed by this Court and those of most other jurisdictions, is that disability insurance policies provide coverage for factual disabilities, but not for purely legal disabilities (see Gassler v Monarch Life Ins. Co., 276 AD2d 585, 586 [2000]; BLH ex rel. GEH v Northwestern Mut. Life Ins. Co., 92 F Supp 2d 910, 915-916 [D Minn 2000]; Solomon v Royal Maccabees Life Ins. Co., 243 Mich App 375, 382-383, 622 NW2d 101, 104 [2000]; see generally 10A Lee Russ, Couch on Insurance 3d § 146:9). The distinction between the two types of disabilities is clear:
“A factual disability is an incapacity caused by illness or injury that prevents a person from engaging in his or her occupation. A legal disability includes all circumstances in which the law does not permit a person to engage in his or her profession even though he or she may be physically and mentally able to do so. The courts have found that a legal disability may be the result of incarceration, the revocation or suspension of a professional license, surrendering a professional license as part of a plea agreement or to avoid disciplinary action, or practice restrictions imposed by a licensing board” (Massachusetts Mut. Life Ins. Co. v Jefferson, 104 SW3d 13, 26-27 [Tenn Ct App 2002] [citations omitted]; see Gassier v Monarch Life Ins. Co., 276 AD2d at 586; Massachusetts Mut. Life Ins. Co. v Ouellette, 159 Vt 187, 190-191, 617 A2d 132, 134 [1992]; see generally 44 Am Jur 2d, Insurance § 1466; 10A Lee Russ, Couch on Insurance 3d § 146:9).
Nonetheless, determining whether an insured’s particular disability should be categorized as primarily factual or legal may prove problematic where there is both a factual and a legal disability, especially in cases of mental illness:
“Frequently, professionals seeking disability benefits have both a legal and a factual disability because of the same condition. As one court noted, ‘a blinded bus driver or a drug addicted pilot may [have] lost their licenses for the same condition that renders them totally disabled to drive or fly.’ Grayboyes v. General Am. Life Ins. Co., 1995 WL 156040, at *8, 1995 U.S. Dist. LEXIS 4233, at *21” (Massachusetts Mut. Life Ins. Co. v Jefferson, 104 SW3d at 27).
*84 When an insured has a legal disability, but also claims a factual disability, the determination of coverage rests on three factors: first, whether the claimed factual disability is medically bona fide; second, whether its onset actually occurred before the legal disability; and, third, whether the factual disability actually prevented or hindered the person seeking disability benefits from engaging in his or her profession or occupation (see 44 Am Jur 2d, Insurance § 1466, citing Massachusetts Mut. Life Ins. Co. v Jefferson, 104 SW3d 13 [2002]). Northwestern’s own guidelines for certain disability policies recognize that factual and legal disabilities may exist concurrently: “[i]f it is determined that there is a disabling illness and the loss of license was secondary to this illness, a total disability claim can be administered as usual.”
The most straightforward situations involving claims when the insured has both a factual and a legal disability are those in which one clearly precedes the other and precludes performance of the principal tasks of the occupation. For example, if an insured is unable, by reason of mental illness, even to attempt to perform the principal duties of the occupation and then surrenders a professional license as a result, the factual disability will be primary. Conversely, when an insured loses a professional license and, as a result, becomes mentally disabled, the legal disability is primary (see Gassler v Monarch Life Ins. Co., 276 AD2d 585 [2000]).
More complicated are situations when an insured suffers from a mental illness but does not cease working at the covered occupation until a legal disability, such as a license suspension, arises. No court of this state has addressed this exact issue, but federal courts and other state courts have. Those courts have focused on whether and how the insured’s mental illness brought about the legal disability. The prevalent rule is that disability insurance benefits are not precluded when an insured loses a professional license because mental illness has rendered him or her unable to perform the core tasks of the occupation safely and competently. Benefits may be precluded, however, when the mental illness has not impaired the insured’s ability to practice safely and competently but causes the insured to engage in misconduct unrelated to the core tasks of the occupation (see Massachusetts Mut. Life Ins. Co. v Jefferson, 104 SW3d 13 [2002]; Solomon v Royal Maccabees Life Ins. Co., 243 Mich App at 385-386, 622 NW2d at 106; Damascus v Provident Life & Acc. Ins. Co., 168 F3d 498 [9th Cir 1999] [table; text at 1999 *85 WL 51490, *2, 1999 US App LEXIS 1234, *8-9 (1999)]; Massachusetts Mut. Life Ins. Co. v Millstein, 129 F3d 688, 691 [2d Cir 1997]; Goomar By & Through Goomar v Centennial Life Ins. Co., 76 F3d 1059, 1063 [9th Cir 1996]; Grayboyes v General Am. Life Ins. Co., 1995 WL 156040, *5, 1995 US Dist LEXIS 4233, *13 [ED Pa, Apr. 4, 1995, No. CIV A. 92 2515]; Massachusetts Mut. Life Ins. Co. v Ouellette, 159 Vt at 190-191, 617 A2d at 134; cf. Corsaut v Equitable Life Assur. Soc. of U.S., 203 Iowa 741, 747-748, 211 NW 222, 224 [1926]; see generally E.L. Kellett, Annotation, Mental Incapacity or Disease as Constituting Total or Permanent Disability Within Insurance Coverage, 22 ALR3d 1000).
The plaintiff contends that, notwithstanding the fact that he had a roomful of waiting patients on the day he was suspended, his mental and psychological condition rendered him “unable to perform the principal duties of’ a plastic surgeon long before he was suspended. In other words, he contends that his preexisting mental illness caused him to perform his occupation incompetently and thus was the primary cause of his inability to practice his profession. The plaintiffs loss of his license, which resulted from his mental illness, was secondary.
Northwestern disagrees, arguing that the plaintiffs disability resulted from the loss of his medical license (a legal disability), not from his bipolar II disorder and drug abuse (factual disabilities) (see Gassler v Monarch Life Ins. Co., 276 AD2d at 585; Massachusetts Mut. Life Ins. Co. v Millstein, 129 F3d at 691-692; Solomon v Royal Maccabees Life Ins. Co., 243 Mich App at 382-383, 622 NW2d at 104). Notably, Northwestern has presented no evidence, either in support of its motion or in opposition to the plaintiffs cross motion, that the plaintiff does not suffer from bipolar disorder and the other claimed conditions. Nor has it offered any evidence that the plaintiffs conditions did not exist prior to the suspension of his license. Rather, Northwestern relies on the undisputed fact that the plaintiff treated patients right up until the date his license was suspended. Additionally, Northwestern asserts that the plaintiff stated in his application for disability benefits that he was unable to perform the duties of his occupation from the date of his suspension. Consequently, Northwestern argues, the plaintiff was not factually disabled at the time his license was suspended: he stopped practicing only because he was forbidden to practice, not because he was unable to practice.
Northwestern’s approach rejects inquiry into insureds’ competence at the principal tasks of their profession. It would cease *86 the inquiry after determining whether the insured was performing those principal tasks at all. Otherwise, Northwestern argues, inquiry would be necessary as to an insured’s mental or physical status on “any given day.” While this approach has the benefit of clarity, it is substantially outweighed by common sense and the reasonable expectations of an insured (see Hannagan v Piedmont Airlines, Inc., 2010 WL 1235395, *6-7, 2010 US Dist LEXIS 31472, *21-22 [ND NY, Mar. 31, 2010, No. 3:07-CV-795 (FJS/DEP)]). Disability insurance is concerned with insureds’ ability—not just their attempt—to do their jobs (see id.). No one would knowingly use a doctor or lawyer, or any other professional or tradesperson, who shows up for work but performs incompetently. Thus, the fact that the plaintiffs waiting room was filled with unwitting patients on the day the plaintiff’s license was suspended is not the end of the inquiry (see Damascus v Provident Life & Acc. Ins. Co., 1999 WL 51490, *2-3, 1999 US App LEXIS 1234, *9-11). We must also examine the ability of the insured to perform the principal tasks of the profession competently.
IV
Northwestern failed to establish its prima facie entitlement to summary judgment (see Zuckerman v City of New York, 49 NY2d 557, 562 [1980]). The evidence it submitted in support of its motion failed to negate, prima facie, any single prerequisite for coverage (see Scarano v Wehrens, 46 AD3d 797, 798 [2007]). First, Northwestern failed to establish that the policies were not in effect when the plaintiffs disability arose. Second, its own evidence established that the plaintiff was under the regular care of a physician within a short period of time from when he sought benefits. And, third, it failed to establish that the plaintiffs disability was not the result of an accident or sickness. Accordingly, the Supreme Court properly denied Northwestern’s motion (see Alvarez v Prospect Hosp., 68 NY2d 320, 324 [1986]).
V
In support of his cross motion, the plaintiff presented his deposition testimony that he first began taking crystal meth in 2001 or 2002 and that in 2003 he went to see a drug therapist. He also testified that, at that time, a doctor who worked with the drug therapist prescribed Wellbutrin to treat his addiction. The plaintiff also submitted the affidavit of the drug therapist, *87 Claudia Albetta, who stated that, during the time she treated the plaintiff, from March 2003 to November 2004, his “symptoms and behavior were fully consistent with a person suffering from Bipolar Disorder” and that it was her opinion at the time “that he was self-medicating a chemical imbalance and in complete denial of his illness.”
Additionally, the plaintiff submitted evidence, in the form of affidavits or affirmations from his psychologist, Dr. Porter, and his treating psychiatrists, Drs. Hoffman, Kirschen, and Montgomery, that he suffers from bipolar II disorder and substance abuse secondary to that disorder. The doctors opined that the plaintiff had been suffering from bipolar II disorder for many years before they began treating him, and that, significantly, its effects rendered him unable to perform “the principal duties of his occupation as a plastic surgeon, let alone safely and competently” before his license was suspended. They agreed that this disorder caused the plaintiff to engage in the conduct for which he later lost his medical license.
Northwestern contends that the affidavits were conclusory, but we disagree. The doctors’ opinions were based on their examinations of the plaintiff, his history, and the statement of charges against him. This evidence, coupled with the plaintiffs deposition testimony, established, prima facie, that the plaintiffs bipolar II disorder and drug addiction were the primary causes of the plaintiffs inability to practice his profession and that the plaintiffs loss of his medical license was secondary. Thus, in his initial moving papers on the cross motion, the plaintiff carried his burden for summary judgment on the first cause of action in the amended complaint, alleging breach of contract (see Wine-grad v New York Univ. Med. Ctr, 64 NY2d 851, 853 [1985]).
In opposition, Northwestern, which did not submit any evidence as to the plaintiffs factual disability (see Paul Revere Life Ins. Co. v Bavaro, 957 F Supp 444, 449 [SD NY 1997]), failed to raise a triable issue of fact (see Alvarez v Prospect Hosp., 68 NY2d at 324). Accordingly, that branch of the plaintiffs cross motion which was for summary judgment on the first cause of action in the amended complaint, alleging breach of contract, should have been granted. In light of this determination, we need not reach the question of whether the Supreme Court properly declined to consider the evidence submitted by the plaintiff in his reply papers.
*88 VI
The parties’ remaining contentions either are without merit or need not be addressed in light of the foregoing.
Accordingly, the order is modified, on the law, by deleting the provision thereof denying that branch of the plaintiff’s cross motion which was for summary judgment on the first cause of action in the amended complaint, alleging breach of contract, and substituting therefor a provision granting that branch of the cross motion; as so modified, the order is affirmed insofar as appealed and cross-appealed from.
Eng, P.J., Skelos and Sgroi, JJ., concur.
Ordered that the order is modified, on the law, by deleting the provision thereof denying that branch of the plaintiff’s cross motion which was for summary judgment on the first cause of action in the amended complaint, alleging breach of contract, and substituting therefor a provision granting that branch of the cross motion; as so modified, the order is affirmed insofar as appealed and cross-appealed from, with costs to the plaintiff.

 The exclusions under section 3 relate to, among other things, preexisting conditions and pregnancy and childbirth; these exclusions are not implicated in this appeal.