**BLH, on behalf of her minor daughters, GEH and AMH, and LB and GB, on behalf of their minor daughter, BMB, Plaintiffs,**

v.

**The NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY, Defendant.**

No. 98 Civ 1487 DDA/FLN.

United States District Court, D. Minnesota.

March 24, 2000.

Linquist & Vennum P.L.L.P. by Robert J. Hennessey, Mark A. Jacobson, Minneapolis, MN, for plaintiffs.

Gray, Plant, Mooty, Mooty & Bennett, P.A. by Erik T. Salveson, Minneapolis, MN, for defendant.

## ORDER

ALSOP, Senior District Judge.

Plaintiffs are minor children who were sexually abused by Dr. RKH. As assignees, they have sued Defendant The Northwestern Mutual Life Insurance Company ("Northwestern Mutual"), asserting that they are entitled to disability payments under three policies issued to RKH. Northwestern Mutual has moved for summary judgment, principally on the ground that RKH's disability was not caused by accident or sickness, but by his criminal conviction and the subsequent decision to revoke his license to practice medicine. The Court finds that there are fact questions on the issue of causation and is unpersuaded by the other reasons Northwestern Mutual cites in support of its motion. The Court therefore will deny the motion.

## I. FACTUAL BACKGROUND

On the night of March 19, 1994, RKH's wife came upon him sexually abusing his eight-year-old daughter. Three days later he was charged with criminal sexual conduct to which he eventually pled guilty. His license to practice medicine was subsequently revoked. The damage he has done to his daughter and his other victims is not at issue in this lawsuit.

### A. Dr. RKH

At the time of his offense, RKH was the medical director of anesthesiology at Rice County District One Hospital in Faribault, Minnesota, a position he had held since 1989. Before that, he worked at Mercy Hospital in Williston, North Dakota for approximately four years. At Mercy Hospital, he served as medical director of anesthesiology, medical director of respiratory therapy, and associate medical director of the intensive care unit. RKH completed his residency in anesthesiology in 1985. He earned his medical degree in 1982 from the University of Arizona.

RKH was not an employee of District One Hospital. Rather, he was a self-employed anesthesiologist with staff privileges. He was, however, the only anesthesiologist on staff, and he worked approximately sixty hours per week and was frequently on call. He also was responsible for supervising three nurse anesthetists. RKH was well compensated, earning approximately $350,000 per year.

Larry Schulz, the administrator for District One Hospital, stated in an affidavit that from "all outward indications, Dr. [RKH] was a skilled and competent anesthesiologist." In fact, RKH was scheduled to perform numerous procedures in the days following his arrest.

On March 22, 1994, three days after his wife discovered him sexually molesting his daughter, RKH was charged with three counts of criminal sexual conduct in the first degree in Minnesota state court. District One Hospital suspended his privileges the same day, prohibiting him from working as an anesthesiologist. He formally resigned at the end of the month.

On June 23, 1994, RKH pled guilty to Count II of the criminal complaint, and Counts I and III were dismissed. The district court sentenced him to 90 months

in prison and imposed a $20,000 fine, both of which were stayed on the condition that he serve 365 days in the Rice County Jail and complete an inpatient treatment at an approved sexual offender program following his release from prison.

After serving his time in jail, RKH entered Alpha Human Services, a sexual treatment program, on June 20, 1995. There, he received treatment over a three year period. Within a month after he entered the program, RKH admitted that he had sexual contact with approximately twenty-six female patients while they were under anesthesia. Of these, RKH said he touched about twenty patients on their breasts and six patients on their genitalia. The age of these patients ranged from fourteen to forty years old, and most were subjected to only one instance of abuse. However, RKH admitted that he was sexually abusive to four of these women on two to five occasions. Dr. Douglas Williams, a licensed psychologist at Alpha Human Services, reported this information to the Minnesota Board of Medical Practice (the "Board").

RKH also admitted during the course of his treatment at Alpha Human Services that he had been abusing his eight-year-old daughter since she was four. In all, RKH admitted that he abused his daughter over three hundred times during this period. RKH also confessed that he had abused his five-year-old daughter on three occasions. Additionally, RKH admitted that he had sexual contact with his nine-year-old niece, the nine-year-old daughter of family friends, and another seven-year-old girl.

On January 6, 1996, the Board issued a Stipulation and Order revoking RKH's license to practice medicine. As grounds for the disciplinary action, the Board cited the criminal conviction, together with other instances of sexual abuse, including the abuse of his patients. The Board concluded that this conduct was inappropriate under Minn.Stat. § 147.091, subd. 1(c), (g), and (*l*), and required disciplinary action.[1] The Board revoked his license, and RKH can no longer practice medicine in the State of Minnesota.

## B. Medical History

On March 25, 1994, shortly after he was charged with his crime but before he pled guilty, RKH voluntarily checked himself into the psychiatric unit at United Hospital in St. Paul, Minnesota. RKH admitted himself after experiencing depression and

---

1. Minn.Stat. § 147.091 provides in relevant part:

**Subdivision 1. Grounds listed.** The board may refuse to grant a license or may impose disciplinary action as described in section 147.141 against any physician. The following conduct is prohibited and is grounds for disciplinary action:

. . . . .

(c) Conviction, during the previous five years, of a felony reasonably related to the practice of medicine or osteopathy. Conviction as used in this subdivision shall include a conviction of an offense which if committed in this state would be deemed a felony without regard to its designation elsewhere, or a criminal proceeding where a finding or verdict of guilt is made or returned but the adjudication of guilt is either withheld or not entered thereon.

. . . . .

(g) Engaging in any unethical conduct; conduct likely to deceive, defraud, or harm the public, or demonstrating a willful or careless disregard for the health, welfare or safety of a patient; or medical practice which is professionally incompetent, in that it may create unnecessary danger to any patient's life, health, or safety, in any of which cases, proof of actual injury need not be established.

. . . . .

(*l*) Inability to practice medicine with reasonable skill and safety to patients by reason of illness, drunkenness, use of drugs, narcotics, chemicals or any other type of material or as a result of any mental or physical condition, including deterioration through the aging process or loss of motor skills.

Minn.Stat. § 147.091, subd. 1(c), (g), and (*l*).

suicidal ideation. He was placed under the care of Dr. Charles McCafferty.

Dr. McCafferty discussed RKH's condition in a letter he wrote on April 18, 1994 to Peter J. Schmitz, RKH's attorney at the time. In the letter, Dr. McCafferty noted that RKH "gave a history of what appeared to be chronic depression over the previous year." Dr. McCafferty noted further that RKH's marriage had suffered "serious problems" in the past two years and RKH "was overly stressed by his work situation." His depression, moreover, "had been aggravated by allegations that he had sexually molested his eight-year-old daughter." Dr. McCafferty concluded that RKH's "[m]ental status examination showed him to be depressed with a flat effect." Dr. McCafferty prescribed Prozac, an antidepressant drug, which RKH continued to take after being discharged in mid-April from United Hospital.

Dr. Scott Johnson evaluated RKH on August 2, 1994, after RKH had pled guilty to his crime. This evaluation was undertaken pursuant to Minnesota's requirement that sex offenders undergo an independent professional assessment of their need for treatment. *See* Minn.Stat. § 609.3452. Dr. Johnson concluded that RKH

> appears to be a sexually preoccupied individual whose masturbation, if not other sexual behaviors, has become compulsively driven. It is unclear whether his sexual attraction towards children has become compulsive as well.... It is unlikely that Dr. [RKH] is exclusively or primarily attracted to children.... Nevertheless, he must be viewed as someone who presents a significant risk to young children to whom he would have unsupervised access.

Dr. Johnson also concluded that RKH was "apt to be defensive, to project blame for his own shortcomings, to deny problems, and to at times be uncooperative in treatment." Dr. Johnson, moreover, questioned RKH's claims of depression, raising the possibility that RKH was attempting to gain sympathy from others. He also warned that RKH's medical practice should be *"restricted* to insure that he is not in a position to sexually exploit vulnerable female patients." (emphasis added). RKH had not yet revealed that he had abused his patients at the time Dr. Johnson issued this warning.

RKH also was seen by David Heacock for an intake evaluation at Alpha Human Services on May 16, 1994. Heacock opined that the "length of time that the sexual abuse took place, the severity of the sexual contact, the presence of a second victim, and his minimization of the sexual abuse cumulatively suggest that his sexually deviant behavior is severely entrenched." He also noted that RKH had "engaged in behaviors which he knew could jeopardize a desirable career."

Finally, at the request of Plaintiffs' counsel, Dr. Thomas G. Gratzer conducted a psychiatric evaluation of RKH on May 3, 1998. The stated purpose of this evaluation was to determine whether RKH had a mental disorder that would impact upon his ability to practice medicine as an anesthesiologist. Since January of 1993, Dr. Gratzer has been involved in the diagnosing, assessment and treatment of sexual disorders, including paraphilic disorders. In his affidavit, Dr. Gratzer explained that paraphilias are a separate category of sexual disorders. The essential features of paraphilia are recurrent, intense, sexually-arousing fantasies, and sexual urges. The sexual behaviors result from these fantasies and are understood to be compulsively driven.

Dr. Gratzer diagnosed RKH with multiple paraphilic disorders, namely pedophilia, voyeurism, paraphilic disorder n.o.s. (fondling anesthetized women and girls), and sexual disorder n.o.s. (i.e., compulsive sexual behavior). Dr. Gratzer said that RKH "has intense, sexually arousing fantasies and urges with associated sexual behaviors that cause significant stress or impairments for periods greater than six months, but whose sexual fantasies involve

culturally sanctioned aspects of normative sexual behaviors and urges." Dr. Gratzer concluded that RKH was sexually preoccupied with a high sexual drive. It was Dr. Gratzer's opinion that RKH's sexual disorders and associated behaviors "have clearly affected his ability to practice anesthesiology."

### C. The Disability Policies

RKH obtained three disability policies through Northwestern Mutual in 1988 and 1989. As a policyholder, RKH is entitled to benefits should he become totally or partially "disabled." Under section 1.2 of the policies, the insured is totally disabled "when he is unable to perform the principal duties of his occupation." Section 1.1 provides further that benefits are provided for the insured's total or partial disability only if "the disability results from an accident or sickness."

RKH first notified Northwestern Mutual on April 19, 1994—that is, a few days after he was discharged from United Hospital and before he pled guilty to his crime—that he was making a claim under his disability policies. The stated reason: "Depression—caused by divorce, etc." He stated further that his disability began on March 21, 1994, the date of his arrest. On February 3, 1995, Northwestern Mutual denied RKH's disability claim on the grounds that RKH's inability to work at his regular occupation was "due to his conviction, incarceration and subsequent loss of employment."

On February 14, 1995, RKH, through his attorney, requested Northwestern Mutual to reconsider its decision. In the letter, RKH's attorney indicated that RKH suffered from pedophilia and this was the cause of the disability. On March 15, 1995, Northwestern Mutual denied the claim, adhering to its earlier position that the disability was caused by the legal consequence of his criminal behavior, not mental illness. On August 10, 1995, RKH's attorney again corresponded with Northwestern Mutual regarding the claim. Northwestern Mutual responded on August 17, 1995, advising RKH that its position remained unchanged.

### II. PROCEDURAL BACKGROUND

Plaintiffs, victims of RKH's abuse, brought the present action after they obtained a civil judgment in excess of $10 million dollars against RKH in Minnesota state court. To satisfy in part the judgment against him, RKH assigned to the three minor Plaintiffs his interest in the disability policies issued by Northwestern Mutual. Plaintiffs, as assignees, sued Northwestern Mutual in this Court for breach of contract after Northwestern Mutual failed to pay benefits to them. Jurisdiction is based on diversity of citizenship, 28 U.S.C. § 1332. The case is now before the Court on Northwestern Mutual's motion for summary judgment.

### III. DISCUSSION

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In considering a motion for summary judgment, a court must view all evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Summary judgment is not appropriate if a reasonable jury could return a verdict for the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

Northwestern Mutual argues that it is entitled to summary judgment for three reasons. First, it argues that RKH has admitted that he was able to work full time without limitation or restriction until his arrest. Second, Northwestern Mutual contends that RKH is unable to practice

medicine solely as a result of the legal and professional consequences of his criminal behavior, and not because of a sickness. Third, Northwestern Mutual asserts that Plaintiffs' claims are barred by public policy.

### A. RKH's Alleged Admissions

█ Northwestern Mutual contends that Plaintiffs' claims are barred based on statements RKH made at his guilty plea hearing and in his sexual offender treatment program. In particular, at his guilty plea hearing, RKH stated that he was not under "any mental or physical disability" at the time he committed his offenses. And, during his sexual offender treatment, Herring said that "his employment situation was essentially the same throughout the time that [he] was abusing" and that "there were no consistent changes in [his] life situation before [his] offenses."

These three statements, by themselves, do not prove as a matter of law that RKH is able to perform the principals duties of his occupation. Instead, the statements should be weighed against the other evidence, set out above, to assess the merits of Plaintiffs' case. *See Glens Falls Group Ins. Corp. v. Hoium,* 294 Minn. 247, 200 N.W.2d 189, 192 (1972) (guilty plea was not "conclusive evidence," although it could be received into evidence as an admission); *see also Transamerica Ins. Co. v. Samuels,* 369 N.W.2d 587, 588–89 (Minn.Ct.App. 1985) (guilty plea did not justify summary judgment). Northwestern Mutual's claims to the contrary are not persuasive.

### B. Causation

Northwestern Mutual next contends that it is entitled to summary judgment because RKH's disability is caused by the legal and professional consequences of his conduct, not by any mental illness. In support, Northwestern Mutual argues that RKH, despite his claimed depression and paraphilic disorders, was able to work full time and perform all of his principal duties until his arrest. It was only because RKH was arrested, convicted, and lost his license that he is no longer practicing medi-

cine. In other words, but for these legal events, RKH would be able to perform the principal duties of his occupation.

█ "It is a general rule that disability insurance policies, such as those at issue in the instant case, provide coverage for *factual disabilities* (i.e., disabilities due to sickness or injury) and not for legal disabilities." *Goomar v. Centennial Life Ins. Co.,* 855 F.Supp. 319, 325 (S.D.Cal.1994), *aff'd,* 76 F.3d 1059 (9th Cir.1996); *see also* 10 *Couch on Insurance* § 146:9 (3d ed.1998). This rule is illustrated by a number of cases (though none from this jurisdiction) denying an insured disability payments where it was clear that the insured was unable to work because of a license suspension or other legal consequence of the insured's unlawful behavior. In one, *Massachusetts Mut. Life Ins. Co. v. Millstein,* 129 F.3d 688 (2nd Cir.1997), the Second Circuit upheld summary judgment in favor of an insurance company against a lawyer who had lost his license and gone to prison for misusing client funds and other fraudulent activities. The lawyer filed for disability payments, alleging he suffered from attention deficit disorder, conduct disorder, and chemical dependency. The evidence, however, showed that the lawyer had suffered from his chemical dependency and other disorders since childhood, and he proved through his own conduct that his disorders had not prevented him from successfully practicing law for fifteen years. *Id.* at 691. In fact, the lawyer admitted that he could still practice law if he were not suspended. *Id.* As a result, the Second Circuit held as a matter of law that the lawyer's disability was caused by his criminal conduct, and not by a physical inability to perform his occupational duties. *Id.*

In another, *Massachusetts Mut. Life Ins. Co. v. Ouellette,* 159 Vt. 187, 617 A.2d 132 (1992), the court upheld summary judgment against an optometrist who filed for disability payments after he was imprisoned for lewd and lascivious conduct with a minor. It was undisputed that the

optometrist suffered from atypical paraphilia, primarily pedophilia, and that this was a recognized mental disorder. The court, however, concluded that the optometrist's sexual disorder did not prevent him from performing all the duties of optometry. *Id.* at 134. As evidence, the court noted that the optometrist was able to practice his profession for nearly ten years after the disorder manifested itself. *Id.* The court concluded that the optometrist "would not have stopped practicing except for the initiation of criminal proceedings, which resulted in incarceration and the surrender of his license." *Id.*

Other cases, however, have found summary judgment to be inappropriate, despite a criminal conviction or license suspension, where a genuine dispute existed on whether the insured's factual disability preceded the legal disability. *See Paul Revere Life Ins. Co. v. Bavaro,* 957 F.Supp. 444, 449 (S.D.N.Y.1997) ("If [Bavaro] demonstrates to the trier of fact that he is unable to work because of his mental and emotional problems then he is entitled to disability payments, despite the existence of his subsequent legal disability. If, however, the trier of fact believes that but for his legal disability he would be able to perform his occupation, then he is not entitled to disability payments."); *see also Damascus v. Provident Life & Accident Ins. Co.,* 168 F.3d 498, 1999 WL 51490, at *1 (9th Cir. Jan.27, 1999) (unpublished table decision) (district court erred in granting summary judgment on dentist's claim that he was "totally disabled" where an issue of material fact remained as to whether his mental illness ultimately led to the revocation of his license).

■ In the instant case, there is no question—at least it is not disputed on this motion—that RKH suffers from a sickness. The issue is whether this sickness has caused him to be disabled. Certainly,

RKH now suffers from a legal disability: he can no longer practice medicine because he has been incarcerated and his license has been revoked. But can it be said that his depression and his paraphilic disorders, which on this record precede his legal disability, are a factual disability which prevent him from performing the principal duties of his occupation? [2]

The Court concludes that a genuine dispute exists on this issue. In arriving at this conclusion, the Court has taken particular note of the evidence that RKH sexually abused his patients. Plaintiffs argue, persuasively in the Court's view, that RKH's secret molestation of patients shows that he was unable to ensure the health and safety of his patients. A reasonable jury could find, as a result, that RKH was unable to perform the principal duties of his occupation, despite his ability to administer anesthetics competently. There is a maxim in medical ethics, often proclaimed as a fundamental principle of the ancient Hippocratic Oath, which suggests as much: "Above all[,] do no harm." Tom L. Beauchamp & James F. Childress, *Principles of Biomedical Ethics* 189 (4th ed.1994).

This fact—that RKH sexually abused twenty-six patients under his care—is a crucial distinguishing element in this case. (Indeed without it, the action might well come within the reasoning of *Millstein* and *Ouellette.*) In *Ouellette,* for example, there was no allegation that the optometrist was abusing his patients. In other cases, too, where courts have found as a matter of law that a plaintiff was not entitled to disability payments for a diagnosed sexual disorder, there was no evidence that the plaintiff was directing his sexually deviant behavior toward the very people he was employed to help. *See Pierce v. Gardner,* 388 F.2d 846 (7th Cir.1967), *cert. denied,* 393 U.S. 885, 89 S.Ct. 197, 21

**2.** RKH's subsequent legal disability does not act as a superseding cause. *See Ohio Nat'l Life Assurance Corp. v. Crampton,* 822 F.Supp. 1230, 1233 (E.D.Va.1993) ("If the disability is medically bona fide and genuinely arose prior to Duke's incarceration, the fact that Duke was eventually imprisoned does not cut off his benefits."), *aff'd,* 53 F.3d 328 (4th Cir.1995); *see also Marion v. Gardner,* 359 F.2d 175, 182 (8th Cir.1966).

L.Ed.2d 162 (1968); *Bertram v. Secretary of Health, Educ. & Welfare*, 385 F.Supp. 755 (E.D.Wis.1974).[3] Here, however, Dr. Gratzer opined that RKH's sexual disorders and associated behaviors "have clearly affected his ability to practice medicine," emphasizing in particular RKH's admitted abuse of his patients. The Board also specifically took into account RKH's abuse of his patients when it revoked his license to practice medicine.

The Court is aware of two cases in which courts have found that a doctor who sexually abused his patients was not disabled. In one, *Grayboyes v. General Am. Life Ins. Co.*, No. CIV.A.92–2515, 1995 WL 156040 (E.D.Pa. April 4, 1995), the court concluded that an orthodontist was not unable to perform the material and substantial duties of his occupation despite "improperly touching" female patients. *Id.* at *8–9. *Grayboyes,* however, was decided after it went to a trial, so it hardly supports Northwestern Mutual's contention that the Court should rule as a matter of law that a doctor who molests his patients is not disabled.

In the other, *Goomar v. Centennial Life Ins. Co.*, 76 F.3d 1059 (9th Cir.1996), *aff'g* 855 F.Supp. 319 (S.D.Cal.1994), the facts are sufficiently distinct to set it apart from the present case. In *Goomar,* a physician had his license to practice medicine revoked in 1987 after he sexually molested four female patients between 1980 and 1984. He filed for disability payments in 1992, claiming that he suffered from a recently diagnosed psychological disability which caused him to molest his patients. The Ninth Circuit upheld the district court's grant of summary judgment in favor of the insurance company, finding that Goomar failed to raise a material issue of fact as to whether his mental illness was disabling. Critical to that court's conclusion was the undisputed evidence that Goomar had "practiced competently for three years after the last incident with no apparent disabling effects from his alleged 'sickness.'" *Id.* at 1063. Indeed, there was expert testimony in that case that Goomar had "the ability to control his own actions" since he stopped molesting patients for several years without incident. *Id.* Thus, *Goomar* is unlike the present case where there is no evidence that RKH was able to stop molesting his patients—on his own volition—and continue to perform the responsibilities of his job without incident. To the contrary, there is expert testimony that RKH's sexual behaviors are "compulsively driven" and that he suffers from a compulsive sexual disorder.

*Marion v. Gardner*, 359 F.2d 175 (8th Cir.1966), lends support to the Court's conclusion that a reasonable jury could find that RKH suffers from a disability. In *Marion,* the Eighth Circuit found that an applicant who suffered from medically diagnosed "uncontrollable" sexual urges was disabled under the Social Security Act, 42 U.S.C. § 423. *Id.* at 181. In so finding, the court noted that the applicant had been committed under the Minnesota Psychopathic Personality Act, a law described as applicable to those persons who "have evidenced an utter lack of power to control their sexual impulses", and who, as a consequence, are likely to be dangerous to others. *Id.* The court concluded that the applicant met the statutory definition of disability, including the requirement that there be an inability to engage in any substantial gainful activity. *Id.* On this, the court said, "Rare, indeed perhaps even non-existent, would be the reputable employer who, knowing of the applicant's assaultive tendencies, would hire him." *Id.* Likewise, in this case, Larry Schulz, the administrator at District One Hospital, stated in his affidavit that had he been aware of "any sexual abuse of patients or inappropriate conduct" by RKH that he "would have considered Dr. [RKH] unfit to work as an anesthesiologist at the hospital."

---

**3.** These cases were decided under the federal Social Security Act, 42 U.S.C. § 423. Courts have found them useful in interpreting private insurance contracts. *See. e.g., Ouellette,* 617 A.2d at 134.

The Court is not unmindful of the phrase that there is a difference between one who should not work and one who is unable to work. But the Court is not prepared to rule as a matter of law that RKH's mental impairment is such that he is *able* to work even though he should not be *allowed* to. This is an issue better left to the finder of fact.[4]

### C. Public Policy

 Northwestern Mutual's final contention is that Plaintiffs' claims should be barred for public policy reasons. It argues that allowing a disability claim would directly reward RKH for his criminal conduct and shift the responsibility for that conduct to other policyholders. *See Millstein,* 129 F.3d at 691 (refusing to let a lawyer benefit from his unlawful actions based on public policy); *Ouellette,* 617 A.2d at 135 (stating that to "impos[e] liability on disability insurance companies . . . would be contrary to the public interest in discouraging coverage for an insured's own intentional criminal conduct").

The Court is not persuaded by Northwestern Mutual's arguments or the cases on which it relies. Plaintiffs are not seeking to recover benefits based on RKH's criminal conduct. Rather, they are alleging that they are entitled to benefits because RKH suffers from a sickness which prevents him from performing the principal duties of his occupation. This brings them squarely within the terms of the policies, and Northwestern Mutual should not be able to avoid this result by invoking public policy. *See Grayboyes,* 1995 WL 156040, at *7 (rejecting public policy argument because plaintiff was "not seeking insurance coverage for liability for criminal conduct," but for a condition that "rendered him totally disabled to practice his profession").

\* \* \* \* \* \*

Upon its review of the files, motions and proceedings herein, it is hereby ORDERED that Defendant The Northwestern Mutual Life Insurance Company's Motion for Summary Judgment is DENIED.

---

**4.** Northwestern Mutual suggests that, even if a reasonable jury could find that RKH suffers from a factual disability, Plaintiffs still could not recover because they are unable to establish that RKH became disabled while the policies were in force, as required by the terms of the policies. The record on this issue, however, is underdeveloped and in dispute.