816 So.2d 587 (2002)
THE FLORIDA BAR, Complainant,
v.
Brian NEIMAN and Brian Neiman, Inc., a Florida corporation, Respondents.
No. SC94738.
Supreme Court of Florida.
May 2, 2002.
John F. Harkness, Jr., Executive Director, and Mary Ellen Bateman, UPL Counsel, The Florida Bar, Tallahassee, FL; Jacquelyn Plasner Needelman, *588 Branch UPL Counsel; and Allan James Sullivan, Co-Bar Counsel of Sullivan & Rivero, P.A., Miami, FL, for Complainant.
H. Dohn Williams, Jr. of Hicks, Anderson & Kneale, P.A., Miami, FL, for Respondents.
PER CURIAM.
We have for review a referee's report recommending that Brian Neiman, individually, and Brian Neiman, Inc., a Florida corporation, ("Neiman"), be enjoined from engaging in the unlicensed practice of law. We have jurisdiction. See art. V, § 15, Fla. Const. For the reasons that follow, we approve the referee's recommended findings of fact and conclusions of law, concluding that the respondents have extensively engaged in the unlicensed practice of law in Florida for many years, and we enjoin such practice in the future.

FACTS AND PROCEEDINGS TO DATE
The Florida Bar filed a twenty-two count[1] petition alleging that the respondents repeatedly engaged in the unlicensed practice of law over a period of approximately seven years. After twenty-one days of hearings, the referee made detailed findings that respondent, Brian Neiman, performed acts commonly understood to be the practice of law, including: serving as a primary contact for conferences on legal disputes; holding himself out as an attorney in dealings with others; attempting to argue and advocate the merits of cases, the applicability of the law, evidentiary issues, liability issues, discovery matters, and settlement matters with opposing counsel; attempting to analyze statutory and case law and to discuss it with clients and opposing counsel; trying to advise clients on the strengths and weaknesses of their cases and on how to proceed; actively participating in and presenting clients' cases at mediation sessions; actively participating in and presenting the complainants' cases at settlement sessions; extensively involving himself with fee arrangements; attempting to advise clients of their obligations under legal documents; drafting detailed letters and legal documents; signing court-filed documents; and discussing legal documents with clients without any attorney present.
The referee further found that Neiman engaged in the unlicensed practice of law based upon the referee's finding that no attorney had any meaningful role in the development or settlement of several of the cases. The referee concluded that in some cases, such as those involved in counts IV, V, VI, and IX (discussed below), Neiman served as a conduit or intermediary for the preparation, consideration, or evaluation of legal matters of claimants who had not initially consulted with any supervising attorney.

REFEREE'S FINDINGS AND CONCLUSIONS
The proceedings below were extensive and an understanding of the facts established during those proceedings is necessary to understand the referee's findings and conclusions, and our approval of those conclusions. Because of the large number of separate incidents, we will discuss the circumstances relevant to only the most representative counts. Neiman concedes in his amended initial brief that the conduct alleged in counts IV, V, VI, VII, and XIII of the Bar's complaint were charged as criminal offenses and, on August 19, 1999, he entered a plea of nolo contendere to five criminal misdemeanor counts of the unlicensed practice of law.

*589 COUNT I
The referee's findings of fact for count I help place the case against Neiman in its overall context. The referee concluded that for over seven years, Brian Neiman, a convicted felon, acted essentially as an attorney, even though he was never licensed to do so.
Before the referee, Neiman claimed his conduct was nothing more than "relaying information" from his employing attorney to another party, whether it be a client, opposing counsel, or another third party. However, the referee rejected this characterization of Neiman's conduct and concluded that the facts showed otherwise. Numerous witnesses testified that Neiman held himself out as an attorney, argued legal issues, and forcefully participated in settlement negotiations. The referee concluded that Neiman's earnings alone were indicative of his role in these cases, noting that Neiman personally received hundreds of thousands of dollars in compensation. For example, the record reflects that in 1995, Neiman personally grossed over $1.4 million in salary from his law-related activities. In 1996, Neiman, who was on probation for a criminal fraud conviction, actually reported to his probation officer that his income was $50,000 per month. A year later, he reported his income as $1 million to $1.5 million annually.

COUNT II
This count concerned Neiman's activities in a personal injury action. In 1995 and 1996, the law firm of Norman Ganz represented a woman claimant in an action stemming from injuries sustained in a golf cart accident. Neiman, then working at the Ganz firm, initially interviewed the woman concerning the facts of her claim and then told her she had a "good case." Neiman admitted that he conducted his own legal research on whether the dangerous instrumentality doctrine applied to the operation of a golf cart, and that he called the client to report the results of the legal research. Neiman was the woman's primary contact in the firm. At the hearings, Neiman admitted detailed knowledge of how the fee agreement was negotiated with the client. He also appeared on the client's behalf at mediation and had settlement discussions with the defending insurer's attorney.
Neiman also engaged in substantial telephone discussions about the case with a second defense attorney. When this attorney would call and attempt to speak with Ganz directly, Neiman, not Ganz, always returned her calls. Neiman engaged this attorney in discussions about discovery and settlement. During these conversations, Neiman was combative and attempted to argue the facts of the case. When the attorney made a settlement offer, Neiman told her the offer was unacceptable and warned that if her client did not offer more money, the client would be "dragged through the coals" and be "required to jump through the hoops." This attorney eventually refused to speak to Neiman further and attempted to notify Ganz by faxed letter. The fax machine, however, was located in Neiman's own office and the attorney never received a response from Ganz.
Importantly, a paralegal of the Ganz firm testified that Neiman was "in charge of the office" during this period. The paralegal testified that Neiman instructed office personnel that if the woman client called, the calls were to be given only to him, even if the client asked for attorney Ganz.
When Neiman received a letter from the claimant terminating the Ganz firm's representation of her, Neiman called her to try to convince her to stay with the firm and offered to reduce "his fee." When the *590 claimant declined his offer, Neiman told her that she would be responsible for the $4,000 to $5,000 in costs the firm had allegedly incurred.

COUNT III
This count involved a case wherein the Ganz firm represented a plaintiff in a wrongful birth case. When the defense attorney called to speak to attorney Ganz, Neiman would usually return the calls. Neiman called the defense attorney directly to argue issues of liability, causation, and damages; and Neiman also presented the defense attorney with a "rock bottom demand figure" that the plaintiff would accept in settlement. Neiman never advised the defense attorney that he was conveying information previously approved or reviewed by Ganz.
Although Ganz appeared with Neiman for the plaintiff at a mediation, Ganz explained to all present that Neiman would handle the mediation for the plaintiff. Thereafter, Ganz spoke very little, while Neiman argued issues of liability, causation, and damages on behalf of the plaintiff. The defense attorney testified that Neiman appeared to be the most knowledgeable person at the Ganz firm regarding the law and facts of the case. Neiman acknowledged that he was responsible for determining the strategy for the firm for such presentations in a case.

COUNTS IV, V, AND VI
These counts asserted that from 1995 through 1998, the Ganz firm represented several individuals in a series of discrimination complaints based on race and disability against the Broward County Clerk of Court. Once again, Neiman was the main contact in the firm for these claimants. He met with them on a number of occasions, often at his own home. As a consequence, several claimants believed Neiman was an attorney. He ran the meetings, explained the fee agreements, discussed the courses the case could take, signed the claimants up with the firm, and assured them that they had a "good case." When explaining actions taken in the case, Neiman spoke in the first person by saying, "I did this" or "I did that." One claimant clearly believed that Neiman was making decisions on the case without consulting any "other attorney." Neiman also wrote and signed Ganz's name on correspondence on the case that Ganz never reviewed.
Opposing counsel were also led to believe that Neiman was an attorney. Neiman spoke with them dozens of times and acted as if he was providing legal representation for the plaintiffs. He discussed both substantive legal and settlement matters, and argued the claimants' positions, applicable law, potential liabilities, and possible damages. Neiman suggested specific language for various agreements and talked about the deposition questions he planned to draft. When some opposing counsel realized that Neiman was not an attorney, they insisted that a Ganz law firm attorney take part in the telephone conferences. Instead, the Ganz attorneys continually referred opposing counsel back to Neiman. Further, in July 1995, Neiman appeared at a settlement conference and advocated the settlement amounts sought by the claimants, and no Ganz attorney even attended this conference.
By November 1995, opposing counsel had warned the Ganz firm that Neiman was improperly discussing substantive legal issues, and the firm then brought in an attorney to assist with the case. However, in March 1997, Neiman contacted opposing counsel to inform them that the Ganz firm had fired the attorney, and he took "credit" for the firing. Notwithstanding previous warnings from opposing counsel, Neiman *591 continued to discuss substantive legal issues with them. During one telephone conference, Neiman had a Ganz attorney join the call so Neiman could engage in extensive settlement discussions with opposing counsel. Although the Ganz attorney spoke occasionally, it was usually to ask Neiman whether a particular provision was satisfactory, rather than vice versa. Drafts of a settlement agreement were sent back and forth, and Neiman faxed opposing counsel revisions to the agreement, which Neiman admitted he had never shown to Ganz. Opposing counsel repeatedly objected to dealing with Neiman, but felt they were forced to deal with him in order to protect their client's interests.
As the case progressed, some claimants developed conflicts of interest, but Neiman made no attempt to resolve the conflicts. Instead, he exacerbated the conflicts by recruiting third parties, including a political acquaintance, to pressure claimants into accepting the terms he dictated. For example, the political acquaintance called a claimant and threatened that Neiman would place a lien on her property if she refused to settle. Neiman also discussed claimants' cases and their legal positions with other clients, as well as with outsiders, in an effort to intimidate the claimants into settlement so he could increase his personal share of any recovery.
In March 1998, a settlement conference took place, and Neiman and an out-of-state attorney attended the conference claiming to represent all of the plaintiffs. Neiman argued legal points for several hours during this eight-hour settlement conference. During these talks it was Neiman who proposed the settlement amounts on behalf of the claimants. He never paused to contact a Ganz attorney for advice or approval on any issues. Eventually, the Clerk of Court agreed to a settlement in excess of one million dollars. Neiman insisted to opposing counsel that he did not want the agreement to specify how much each claimant would receive and that he wanted a lump sum for the claimants to divide among themselves. Neiman then deceived the Ganz firm's clients about the amount of the settlement and the amount of the distribution to them. He manipulated the distribution of the settlement funds so that he and his affiliated attorneys received over fifty percent of the funds, while some claimants received as little as $10,000 or $20,000. Although some claimants requested a complete breakdown of all sums received, they were never given a final breakdown of the total settlement amount. Each claimant was advised only of his or her allotted portion of the settlement proceeds.

COUNT IX
This count involved the Ganz firm's representation of individuals in a racial discrimination complaint against Avis Rent-A-Car Systems, Inc. Two Haitian Americans, who worked for Avis, visited the local NAACP office to complain of perceived racial discrimination. The NAACP then arranged a meeting for them with Neiman, whom the Haitian-Americans believed was an attorney. During this meeting, Neiman discussed various aspects of their case and assured them that they "definitely had a case." No Ganz attorney attended this meeting.
The next meeting included additional Avis employees who believed they also had claims. While a Ganz attorney was initially present with Neiman, the attorney did not take an active role in the discussions and left soon after the meeting began. Neiman told the individuals that they "had a case" and that he had significant experience with such cases. Neiman presented the individuals with extensive representation agreements that he wanted *592 them to sign and, although some did not want to sign, Neiman eventually convinced each to sign. Each agreement contained a paragraph setting forth an "engagement fee," the amount of which was left blank. The claimants never saw a Ganz attorney sign these agreements on behalf of the firm. A Caucasian woman from Avis also attended the meeting, serving as the union's representative in support of the Haitian workers. When Neiman learned that the woman had minority family members, he solicited her to join the legal action as a party.
Neiman presided over several other meetings in which he discussed strategies and settlement options with the claimants. When he recommended settlement, the Caucasian woman was concerned because her retirement pension would increase significantly if she reached her twenty-year anniversary of employment with Avis, which was just over one year away. Neiman suggested that he and this woman call the pension officials of the company. When she made the call, with Neiman on the line, she told the Avis officials that her attorney was on the line and that he would negotiate the matter for her. Neiman did not inform the pension official that he was not an attorney.
Eventually, a presettlement conference took place with the attorneys for Avis. Before this meeting, Neiman advised each party what they should expect to receive. Neiman attended this meeting and brought attorney Saul Smolar of the Ganz firm, and also an out-of-state attorney, who was not licensed in Florida, but who spoke French, as well as attorney Barry Mandelkorn, who was not with the Ganz firm, to the meeting. Neiman falsely told Mandelkorn the parties had agreed to a specified minimum amount. During the meeting, Neiman spoke on behalf of the claimants.
Avis eventually agreed to a settlement under the terms of which the Caucasian woman would lose her entitlement to the pension benefits she desired. Neiman told her she should accept the settlement anyway, because it was the best she would get, and that even if she rejected the settlement, Avis was going to fire her. When other claimants also expressed dissatisfaction with the settlement, Neiman told one claimant that Neiman "would take care of him" if he would get the other Haitians to agree to the settlement. Eventually, each claimant did agree, and the one who assisted Neiman received an additional $10,000. None of the attorneys involved spoke with the claimants about the terms of the settlement.
Neiman never told the claimants the total amount of the settlement. Instead, he disclosed to each person only what he or she was receiving. Neiman himself disbursed the settlement checks at his office, having each claimant sign a "receipt" that Neiman wrote in his own handwriting. After each claimant had signed, Neiman altered the document into a "closing statement" by adding waiver language and the amounts each attorney received. Several claimants attempted to obtain a copy of the "receipt" they had signed, but Neiman denied their requests, claiming the documents were confidential. Neiman also demanded a $5,000 engagement fee from each claimant, over and above that which he received as a fee in the case. This fee was not previously disclosed to or accepted by any claimant. Neiman never forwarded a copy of the closing statement to the other attorneys in the case.
Although no active litigation ever took place, and actual costs were only $52, the portion for the "attorneys" amounted to almost fifty percent of the total settlement of the Avis case. The settlement was $573,420 and the Ganz firm retained *593 $239,368, with Barry Mandelkorn receiving $20,000 and the out-of-state attorney receiving $20,000.

COUNT XVIII
During 1998, Neiman was working with the Smolar law firm, which was involved in federal litigation regarding discrimination claims against SunTrust Bank. Neiman stipulated that during the SunTrust matter he signed a federal complaint and discovery documents using Smolar's name, and this action directly violated federal court rules. Neiman testified that he routinely signed Smolar's name to court-filed documents.
When SunTrust directed an attorney to handle the complaint and the SunTrust attorney called Smolar's office, both Smolar and Neiman joined in the call. Neiman failed to disclose that he was not an attorney. Neiman discussed the factual allegations in the complaint, and brought up the possibility of NAACP involvement. Upon completion of the call, the SunTrust attorney concluded that Neiman was an attorney.
When SunTrust brought in a second attorney to assist with the case, he telephoned the Smolar firm and asked to speak to the "person responsible for the case." Neiman took the call and stated that he was responsible for the case. When the attorney asked to reschedule an upcoming settlement meeting, Neiman agreed to do so and, just as with the cases in the other counts, Neiman spoke in the first person, but failed to disclose that he was only a paralegal. The attorney testified that after the telephone conversation, he thought Neiman was an attorney, and, in subsequent correspondence the attorney referred to Neiman as "Brian Neiman, Esq."
Several days later, the second attorney and a colleague attended a meeting with Neiman, Smolar, and one of the plaintiffs. Neiman presented the case, argued the applicable law, and stated that they would bring in another firm to try the case if it went to trial. Neiman argued that the complaint was not vulnerable to a motion to dismiss, and that applicable law would prevent SunTrust from severing the plaintiffs' claims. Neiman spoke of the standards of proof required and the elements of the causes of action, and clearly advocated the position of the Smolar firm's clients. Neiman stated that he had the authority to settle on behalf of all the plaintiffs in the case, even though only one plaintiff was present, and he never sought guidance from Smolar during the discussions.
In fact, Smolar did not speak at the meeting until someone asked whether Neiman was an attorney. When informed that Neiman was not an attorney, the SunTrust attorneys declined to hear further from Neiman and demanded to hear directly from attorney Smolar. Smolar attempted to take over the presentation, but was unable to keep up with the discussion without continually seeking guidance from Neiman.

COUNT XXI
In 1998, Neiman and the Ganz firm were involved in federal litigation regarding sexual harassment claims against a local CBS affiliate and one of its employees. The Ganz firm was referred to the corporate labor counsel for CBS, and Neiman placed a call to that corporate counsel and stated that he was going to file a complaint against CBS alleging tort and federal civil rights violations. Neiman forcefully argued that the Ganz firm's client, a black man, was being sexually harassed by a white female CBS reporter. Neiman stated that the client had gone to the NAACP, and as general counsel for the NAACP, *594 Neiman's firm was handling the matter. He claimed that federal jurisdiction arose because the client was black, and that CBS would have handled the matter differently if he had been white. Neiman stated that his firm would attempt to obtain an injunction against the CBS affiliate.
After making this presentation, Neiman told corporate counsel that he was calling to propose the following settlement: the client would take a polygraph test on the issues of harassment. If the client passed, CBS would agree to give the client two years' salary and pay his attorneys' fees. In exchange, the client would resign. Corporate counsel declined the offer to settle, but agreed to travel to Florida to meet with the client. Based on the manner in which Neiman handled the telephone conversation, corporate counsel concluded that Neiman was a lawyer.
The next day, corporate counsel received another telephone call from Neiman, who was upset because the local CBS affiliate had refused to give the client the entire day off for the upcoming meeting. Neiman told corporate counsel the client needed the whole day off because "I [Neiman] want to prepare him for the meeting." Corporate counsel then arranged for the client to have the day off.
The subsequent meeting was held at the offices of another law firm, although no attorney from that firm attended the meeting. The CBS vice-president of human resources appeared along with corporate counsel. Neiman and an attorney affiliated with the Ganz firm appeared along with the client. Neiman conducted the meeting, which lasted well over an hour. During the client's description of his grievances, Neiman would interrupt him to elaborate. Even though the Ganz affiliated attorney was present, her participation was minimal.
Neiman then tried to get CBS to settle, advocating the client's position by saying, "Can't you see how bad this looks," "you ought to settle," and "you have ruined this guy's life." Neiman told corporate counsel and the CBS vice-president that if CBS did not settle, he was going to sue them. The case did not settle at that meeting. Subsequently, corporate counsel received a letter from the Ganz firm which clearly indicated that Neiman was not an attorney. Corporate counsel then contacted Ganz directly, and the case was settled thereafter.

REFEREE'S CONCLUSION
Having made these findings of fact, as well as findings on other counts we have not discussed, the referee concluded that Neiman had extensively engaged in the unlicensed practice of law for years. The referee found that Neiman had not been properly acting as a paralegal. Rather, the referee concluded that Neiman appeared to be a businessman who was trying to use his association with a law firm to run a lucrative business.
As noted above, the referee made detailed findings concluding that Neiman performed acts commonly understood to be the practice of law, such as: holding himself out as an attorney in dealings with others; attempting to argue and advocate the merits of cases, the applicability of the law, evidentiary issues, liability issues, discovery matters, and settlement matters with opposing counsel; and attempting to analyze statutory and case law and to discuss it with clients and opposing counsel.
Further, the referee found that not only was Neiman not supervised by an attorney, Neiman actually "ran the show" in his law-related activities at the law firm. The referee noted that: (1) Neiman required that he be the person who opened the firm's mail each day unless he was not *595 present in the office; (2) the firm's fax machine was located in Neiman's own office so he could monitor incoming faxes; (3) Neiman reprimanded Ganz, his purported boss, when Ganz would leave work early; (4) Neiman decided which cases the firm would or would not accept; (5) Neiman set his own schedule and work hours; and (6) upon leaving the Ganz firm, Neiman retained access to many of the firm's files.
The referee ultimately concluded that Neiman had performed services under a course of conduct that "affect[ed] important rights of a person under the law, and... the reasonable protection of the rights and property of those advised and served require[d] that [Neiman] possess legal skill and a knowledge of the law greater than that possessed by the average citizen." See State ex rel. Florida Bar v. Sperry, 140 So.2d 587, 591 (Fla.1962), vacated on other grounds, 373 U.S. 379, 83 S.Ct. 1322, 10 L.Ed.2d 428 (1963).

RECOMMENDED INJUNCTION
Having found that Neiman engaged in the unlicensed practice of law, the referee recommended that this Court comprehensively enjoin Neiman from:
a. having direct contact with any client, opposing counsel or third party, unless it involves Neiman's own personal legal matters;
b. without limiting the above, discussing, construing or interpreting the applicability of any caselaw, statutory law or any other law with any opposing counsel or other third party;
c. speaking on behalf of third parties at settlement conferences, meetings, negotiations or mediations, even with an attorney present;
d. appearing on behalf of third parties at settlement meetings, negotiations or mediations without the attorney present for whom [Neiman] is employed;
e. without limiting the above, providing third parties advice on the strengths and weaknesses of any legal matter, or making decisions on behalf of others that require legal skill and a knowledge of the law greater than the average citizen;
f. without limiting the above, advising third parties as to various legal remedies available to them and possible courses of action;
g. preparing pleadings, motions or any other legal documents for others, and, without limiting the above, explaining to third parties the legal significance of any document;
h. without limiting the above, having direct contact in the nature of consultation, explanation, recommendation, advice or assistance in the selection of any legal remedy or course of action;
i. suggesting, directing or participating in the accumulation of evidence supporting any legal claim;
j. holding [himself] out to third parties in such a manner that a third party places some reliance on [him] to handle legal matters;
k. impliedly holding himself out as an attorney;
l. without limiting the above, serving as a conduit or intermediary for the obtaining or relaying of any information for the preparation, consideration or evaluation of any legal matter from others who have never consulted with [Neiman's] supervising attorney;
m. soliciting or accepting attorney's fees;
n. without limiting the above, corresponding with parties or attorneys of parties as the representative of any client relating to legal matters;

*596 o. signing any letter, pleading or other document on behalf of any attorney or under any attorney's signature, even with such attorney's consent;
p. and from otherwise engaging in the practice of law in the State of Florida until such time as Respondent Brian Neiman is duly licensed to practice [law] in this state.

ANALYSIS
Neiman now petitions for review asserting three claims: (1) that participating in settlement negotiations does not constitute the unlicensed practice of law; (2) that the referee's recommendation to enjoin Neiman from participating in settlement negotiations violates the Equal Protection Clause; and (3) that three of the referee's recommended injunction provisions are overbroad, prohibiting Neiman from performing routine paralegal activities. As a preliminary matter, Neiman does not contest the referee's recommended findings of fact. Therefore, we approve the findings of fact. We sequentially address Neiman's challenges to the referee's report.
First, Neiman argues that participating in settlement negotiations does not constitute the unlicensed practice of law.
This Court has held that a referee's conclusion that a nonlawyer has engaged in the unlicensed practice of law is "presumed correct and will be upheld unless clearly erroneous or without support in the record." Florida Bar v. Embassy of Heaven Church, 761 So.2d 1053, 1054 (Fla. 2000) (quoting Florida Bar v. Weisser, 721 So.2d 1142, 1144 (Fla.1998)). We find the referee's conclusion that Neiman's conduct during settlement negotiations constituted the unlicensed practice of law is sound and supported in the record.
This Court has held that defining the practice of law must be considered in the context of our obligation to protect the public:
[I]n determining whether the giving of advice and counsel and the performance of services in legal matters for compensation constitute the practice of law it is safe to follow the rule that if the giving of such advice and performance of such services affect important rights of a person under the law, and if the reasonable protection of the rights and property of those advised and served requires that the persons giving such advice possess legal skill and a knowledge of the law greater than that possessed by the average citizen, then the giving of such advice and the performance of such services by one for another as a course of conduct constitute the practice of law.
State ex rel. Florida Bar v. Sperry, 140 So.2d 587, 591 (Fla.1962). Applying this definition to the facts of the instant case, the record shows that Neiman committed an extensive number of acts constituting the unlicensed practice of law when he participated in settlement negotiations as if he were legal counsel for one of the parties. The acts included discussing case law and legal strategy with clients; speaking on behalf of clients; and arguing the legal merits of cases, as well as other activity usually reserved only to the judgment of a person educated, trained, and licensed in the practice of law.
Moreover, in Florida Bar v. Schramek, 616 So.2d 979, 983 (Fla.1993), this Court emphasized that the major purpose for prohibiting the unlicensed practice of law is to protect the consuming public from being advised and represented in legal matters by unqualified persons who may put the consuming public's interests at risk. See also Florida Bar v. Furman, 376 So.2d 378, 381 (Fla.1979). Indeed, considering the facts in the instant case, it is apparent that Neiman's activities are *597 precisely the type of harmful behavior that this Court strives to prevent in prohibiting the unlicensed practice of law. Those activities include misleading claimants and others so they believed he was an attorney; convincing people he could adequately represent them in their legal matters; making huge personal profits, while giving the actual claimants only small portions of the settlements; and even causing one claimant to lose certain pension benefits. See Schramek, 616 So.2d at 983.
Neiman further argues that enjoining him from participating in settlement negotiations, while permitting certain nonlawyers such as insurance claims adjusters to participate in such negotiations, would violate his constitutional right to the equal protection of the law. We find no merit to this argument.
We have generally held that "regulating the practice of law among nonlawyers does not violate nonlawyers' constitutional rights." Florida Bar v. Miravalle, 761 So.2d 1049, 1052 (Fla.2000). Further, it has been observed that employment as a paralegal does not create any fundamental interests, and paralegals are not a suspect class for purposes of equal protection analysis. See Monroe v. Horwitch, 820 F.Supp. 682 (D.Conn.1993) (holding that differential treatment of paralegals, depending upon the existence of attorney supervision, did not violate equal protection), aff'd, 19 F.3d 9 (2d Cir. 1994). In Monroe, the United States District Court for the District of Connecticut addressed a similar equal protection claim by a paralegal and found:
No fundamental interest is at stake. "The Constitution does not create fundamental interests in particular types of employment." Edelstein v. Wilentz, 812 F.2d 128, 132 (3rd Cir.1987), citing Massachusetts Bd. of Retirement v. Murgia, 427 U.S. 307, 313, 96 S.Ct. 2562, 2567, 49 L.Ed.2d 520 (1976). Nor is the class of individuals regulated inherently suspect. A suspect class is one "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." Massachusetts Bd. of Retirement, 427 U.S. at 313, 96 S.Ct. at 2567.
Id. at 687. Because the regulation of the unlicensed practice of law serves the critical role of protecting the public from unqualified individuals who attempt to perform legal services, nonlawyers do not have a constitutional right to practice law by participating in settlement negotiations or giving legal advice. See Miravalle, 761 So.2d at 1052. There is simply no constitutional right to engage in the unlicensed practice of law.
Finally, Neiman argues that three of the referee's recommended injunction provisions are overbroad, prohibiting him from performing routine paralegal activities:
a. having direct contact with any client, opposing counsel or third party, unless it involves Neiman's own personal legal matters; ...
g. preparing pleadings, motions or any other legal documents for others, and, without limiting the above, explaining to third parties the legal significance of any document; ...
i. suggesting, directing or participating in the accumulation of evidence supporting any legal claim....
Neiman suggests, for example, that these recommendations prohibit him from: answering the phone because it could be a client; scheduling meetings for an employing attorney; drafting any documents whatsoever for an employing attorney; *598 and picking up medical records. He states that these recommendations effectively bar him from setting foot inside his employer's law office. We disagree.
Neiman's argument overlooks the facts found by the referee and approved by this Court as well as the referee's and this Court's conclusion in this case that he has been conclusively proven to have extensively engaged in the unlicensed practice of law for profit.
The referee's recommended terms of injunction are based on Neiman's demonstrated misconduct. Therefore, Neiman's compliance with the terms of the recommended injunction shall be interpreted in accordance with this Court's definition of the practice of law in Sperry, set out above. We find the challenged provisions appropriate in the present case based on the egregious and cumulative acts that Neiman perpetrated repeatedly for approximately seven years. He held himself out as an attorney and used this persona to take advantage of numerous members of the public for his personal financial profit. In view of these facts, we conclude the referee's recommendations as to the terms of the injunction are warranted and are clearly necessary for the protection of the public.
Although there is no Rule Regulating the Florida Bar specifically dealing with the employment of paralegals, the rules provide guidance concerning the employment of suspended attorneys and attorneys who have been disbarred or whose disciplinary resignations have been allowed. Rule 3-6.1 (Employment of Certain Attorneys or Former Attorneys) provides that an "authorized business entity (as defined elsewhere in these rules), may employ individuals subject to this rule to perform such services only as may ethically be performed by other lay persons employed by authorized business entities." Further, subdivision (d) of rule 3-6.1 (Client Contact) provides that "[n]o employee shall have direct contact with any client. Direct client contact does not include the participation of the employee as an observer in any meeting, hearing, or interaction between a supervising attorney and a client." In light of this language, we conclude that paralegals may only perform such services as may be ethically performed by other lay persons employed by the business entity. Therefore, if suspended or former attorneys are not allowed to have client contact, as described in rule 3-6.1, then neither should paralegals.
Neiman argues that this recommendation will enjoin him from performing menial tasks like answering the telephone for fear that he would have contact with a client, opposing party, or third party. Neiman has unnecessarily interpreted this recommendation to the extreme because the purpose of the referee's recommendation is to prevent the unlicensed practice of law. Thus, for Neiman to violate the injunction, he would have to engage in conduct similar to that which the referee has already reviewed and concluded constitutes the unlicensed practice of law. Obviously, answering the telephone without discussing any legal matter would not constitute the unlicensed practice of law according to Sperry and, therefore, would not violate the injunction.
Neiman also argues that the referee's recommendation that he be enjoined from "preparing pleadings, motions or any other legal documents for others, and, without limiting the above, explaining to third parties the legal significance of any document" is overbroad because it precludes him from preparing such documents under the supervision of his employing attorney. We disagree because the term "others" does not include a supervising *599 attorney, particularly because a supervising attorney must approve and sign a prepared document before it is filed with a court. As a result, the document is not attributed to the paralegal, but to the supervising attorney. Also, we note that the referee clarified his recommendation about the preparation of documents by further recommending that Neiman be enjoined from "explaining to third parties the legal significance of any document." This specific language has been used previously by this Court in enjoining nonlawyers from "preparing pleadings and any other legal documents for others." Florida Bar v. Eubanks, 752 So.2d 540, 544 (Fla.1999). Although a clearer recommendation may have been to enjoin Neiman from preparing documents for third parties or for anyone other than a supervising attorney, we conclude that the referee's recommendation under the circumstances of this case that Neiman be enjoined from preparing legal documents for others is not overbroad.
Finally, Neiman argues that the referee's recommendation that he be enjoined from "suggesting, directing or participating in the accumulation of evidence supporting any legal claim" is overbroad because it would preclude him from participating in such tasks as picking up medical records from a custodian of records. This Court has enjoined nonlawyers from "suggesting, directing, or participating in the accumulation of evidence to be submitted with the completed forms." Eubanks, 752 So.2d at 544 (emphasis added); see Schramek, 616 So.2d at 987; Florida Bar v. King, 468 So.2d 982, 983 (Fla.1985). The referee's recommendation in the instant case is similar to the cited cases in that it enjoins Neiman from having a directive role in the accumulation of evidence. Although Neiman argues that this language will prevent him from doing ministerial tasks for his employing attorney, under the attorney's direct supervision, we disagree. To use Neiman's example, picking up medical records does not involve his "suggesting, directing, or participating in the accumulation of evidence" because it does not ordinarily involve a determination of what evidence should be accumulated. Rather, it is purely a ministerial act at the direction of his supervising attorney. Simply picking up medical records as a courier would not constitute the unlicensed practice of law and, therefore, would not violate the injunction.

CONCLUSION
Accordingly, based upon the circumstances and analysis set out above, we agree with the referee that Neiman has improperly engaged in the unlicensed practice of law for profit for years. In common parlance, Neiman's activities fail the "duck" test. That is, in common parlance, one would expect that if it looks like a duck, and walks, talks, and acts like a duck, one can usually safely assume it is a duck. Unfortunately, while Neiman at all times acted like an educated and licensed lawyer, he was not. And, just as the public must be protected from uneducated and unlicensed physicians in an operating room, the public must be protected from bogus attorneys seeking to profit from the problems of the innocent and uninformed with serious personal and legal problems who may be taken in by a smooth but deceitful demeanor. We therefore approve the referee's report and recommendations in their entirety and we hereby enjoin Brian Neiman, individually, and Brian Neiman, Inc., a Florida corporation, from engaging in the unlicensed practice of law in the State of Florida, including those *600 activities specified in the referee's report and quoted above. Judgment is entered for The Florida Bar, 650 Apalachee Parkway, Tallahassee, Florida 32399, for recovery of costs from Brian Neiman, individually, and Brian Neiman, Inc., jointly and severally, in the amount of $28,726.16, for which sum let execution issue.
It is so ordered.
WELLS, C.J., and SHAW, HARDING, ANSTEAD, PARIENTE, LEWIS, and QUINCE, JJ., concur.
NOTES
[1] The referee struck counts VIIA, X, XI, XIV, XIX, and XX.