Brian **NEIMAN**, Plaintiff,

v.

**PROVIDENT LIFE & ACCIDENT INSURANCE CO.**, Defendant.

No. 00–2140–CIV.

United States District Court, S.D. Florida.

Aug. 26, 2002.

---

H. Dohn Williams, Jr., Hicks, Anderson & Kneale, P.A., Miami, FL, James J. Seltzer, Emeryville, CA, for Plaintiff.

John T. Kolinski, Robert A. Wainger, Kai E. Jacobs, Shutts and Bowen, Miami, FL, for Defendant.

### ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

MORENO, District Judge.

Brian Neiman, who has been found guilty of illegally practicing law, seeks disability benefits to compensate him for loss of income derived entirely from that illegal activity. The Court grants summary judgment in favor of the insurer, precluding the Plaintiff from recovering under his disability insurance policy for an occupation he could not legally perform prior to his alleged disability.

On May 2, 2002, the Florida Supreme Court stated:

> Neiman's activities fail the "duck" test. That is, in common parlance, one would expect that if it looks like a duck, and walks, talks, and acts like a duck, one can usually safely assume it is a duck. Unfortunately, while Neiman at all times acted like an educated and licensed lawyer, he was not. And, just as the public must be protected from uneducated and unlicensed physicians in an operating room, the public must be protected from bogus attorneys seeking to profit from the problems of the innocent and uninformed with serious personal and legal problems who may be taken in by a smooth but deceitful demeanor.

*The Florida Bar v. Neiman,* 816 So.2d 587, 599 (Fla.2002). Neiman argues this Court should toss aside the Florida Supreme Court's decision, with a wink and a nod, and allow a jury to revisit this issue in deciding whether to award him benefits. To allow Neiman to proceed to trial to obtain benefits that would indemnify the loss of his illegal income would not only legitimize his conduct but vitiate the Florida Supreme Court's unequivocal opinion.

## LEGAL STANDARD

Summary judgment is authorized where there is no genuine issue of material fact. Fed.R.Civ.P. 56(c). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The party opposing the motion for summary judgment may not simply rest upon mere allegations or denials of the pleadings; the non-moving party must establish the essential elements of its case on which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The nonmovant must present more than a scintilla of evidence in support of the nonmovant's position. A jury must be able reasonably to find for the nonmovant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## FACTUAL BACKGROUND

Brian Neiman applied for disability insurance from Provident Life and Accident Insurance Company on October 3, 1989. On January 26, 2000, Neiman submitted a claim for disability benefits for the period spanning from May 1999 through December 2001, alleging that his bipolar II disorder prevented him from working as a paralegal during that time. This lawsuit stems from coverage under that policy.

1. *Proceedings Relating to the Unlawful Practice of Law*

In January 1999 prior to the alleged onset of the bipolar II disorder, the Florida Bar filed a multi-count complaint against Neiman. And, the Broward County State Attorney's Office instituted criminal charges against him for illegally practicing law.

The onset of Neiman's disability in May 1999, was during the pendency of the criminal and Bar proceedings against him. Neiman pled *nolo contendere* to the criminal charges on August 19, 1999, three months after the onset of the bipolar II disorder. Pursuant to the *nolo* plea, the criminal court placed Neiman on probation and enjoined him from practicing law illegally. The Bar proceedings were abated pending resolution of the criminal case. On September 22, 1999, the parties asked the Florida Supreme Court to appoint a referee to adjudicate the Bar complaint. The Florida Supreme Court appointed Broward County Judge Robert W. Lee to adjudicate the Bar's complaint. Referee Lee conducted a twenty-one day trial during the summer of 2000. In a fifty-seven page order entered in September 2000, Referee Lee detailed Neiman's unlawful practice since early 1991. The Florida Supreme Court on May 2, 2002, affirmed the referee's order in its entirety finding Neiman had unlawfully practiced law over a period of seven years.

Adopting the referee's recommendation in its entirety, the Florida Supreme Court enjoined Neiman in sixteen different, yet related, ways. The Florida Supreme Court conclusively determined that Neiman's occupations and duties consisted of the unlicensed and otherwise illegal practice of law. It stated, "we agree with the

referee that Neiman has improperly engaged in the unlicensed practice of law for profit for years...We therefore approve the referee's report and recommendations in their entirety and we hereby enjoin Brian Neiman, individually, and Brian Neiman, Inc., a Florida corporation, from engaging in the unlicensed practice of law in the State of Florida, including those activities specified in the referee's report...."
*Neiman,* 816 So.2d 587, 599 (Fla.2002).

In addition to the Bar and criminal proceedings, the United States District Court for the Southern District of Florida has repeatedly sanctioned Neiman for unethical conduct. For instance, Judge Middlebrooks in *Linden Adams v. BellSouth Telecomms., Inc.,* Case No. 96–2473–CIV–MIDDLEBROOKS, referred Neiman to the United States Attorney's Office for criminal investigation for failing to disclose the total amount of a settlement to a group of plaintiffs he represented, a deceitful maneuver enabling a windfall in his favor. Referee Lee found that Neiman repeatedly employed this technique enabling him to make exorbitant amounts of money for a lawyer, much less a paralegal. Neiman personally grossed over $1.4 million in 1995. That amount dropped in 1996 to almost half a million dollars and again climbed to over a million in 1997. At the expense of his clients, Neiman behaved unethically and made millions. *See also John Martin v. Lamborghini,* Case No. 98–6621–CIVDIMITROULEAS (holding Neiman committed Rule 11 violations and dismissing case as a sanction); *Doris Hudson, et al. v. Ocean Spray Cranberries, Inc.,* Case No. 98–6603–CIV–SEITZ (criticizing Neiman's conduct as unethical); *Kimberly Barnett, et al. v. Subway Dev. of S. Fla., Inc.,* Case No. 95–6387–CIV–RYSKAMP (criticizing Neiman's conduct as unethical); *Renee Ingram, et al. v. SunTrust Bank of S. Fla.,* Case No. 98–7023–CIV–HURLEY (magistrate recommended that Neiman pay $10,000 fine and be held in contempt; district court never reached issue because the case settled and the motion for sanctions was withdrawn).

Despite this history, Neiman vehemently argues here that no legal restraint prevented him from working as a "paralegal" during the time for which he claims benefits. He claims that only the bipolar II disorder prevented him from working as a "paralegal" during that time.

2.  *Neiman's Dealings with Provident*

As mentioned, Neiman purchased the disability insurance policy in 1989. That policy listed Neiman's income as $130,000 and his occupation as paralegal/investigator. In the years that followed, Provident, upon Neiman's application, increased the benefits amounts and adjusted the premiums due.

In the mid–1990's, Neiman was prosecuted for a number of theft-related criminal offenses. One of the criminal charges alleged Neiman committed insurance fraud regarding his collecting two months of disability income benefits from Provident. Neiman entered an *Alford*[1] plea, without admitting guilt; the court placed Neiman on probation and ordered he pay restitution. In mid–1996 after Neiman entered the plea, Provident sued Neiman to rescind the disability policy. That suit was dismissed in February 1997 because Provident did not meet the contractual provisions to rescind the policy.

The policy remained in effect and on January 26, 2000, Neiman submitted a claim to Provident for the recovery of dis-

---

**1.** An *Alford* plea is a guilty plea entered into by a defendant in connection with a plea bargain, without actually admitting guilt.

*North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).

ability benefits dating from May 17, 1999. As part of his claim for benefits, Neiman completed, executed, and delivered to Provident a "Claimant Occupation Description" defining his occupation during the preceding *ten* years as a "senior paralegal."

At summary judgment, Neiman argues he is entitled to residual disability benefits under the policy, which provides as follows:

> Residual Disability or residually disabled, during the Elimination Period, means that due to Injuries or Sickness:
>
> 1.) you are not able to do one or more of your substantial and material daily business duties or you are not able to do your usual daily business duties for as much time as it would normally take you to do them;
>
> 2.) you have a Loss of Monthly Income in your occupation of at least 20%; and
>
> 3.) you are receiving care by a physician which is appropriate for the condition causing disability.

### 3. *Summary Judgment*

Defendant Provident argues at summary judgment that the policy is unenforceable as a matter of law and public policy. Arguing that an award for disability benefits would be tantamount to legitimizing and indemnifying Neiman's illegal activity, Provident urges the Court to render the contract unenforceable. Alternatively, Provident has moved to assert a counterclaim for rescission of the contract.

Neiman makes two main arguments at summary judgment. First, Neiman states that he should recover under the policy even if he was engaged in the unauthorized practice of law. Second, Neiman argues he should recover to the extent the bipolar II disorder prevented him from carrying on paralegal activities.

## LEGAL ANALYSIS

### 1. The Florida Supreme Court Decision

The Court begins by demarking what the Florida Supreme Court did and did not do in *The Florida Bar v. Neiman*, 816 So.2d 587 (Fla.2002). In its opinion, the Florida Supreme Court unquestionably determined that Neiman illegally practiced law for many years. It did not endeavor to draw the line between what activities Neiman engaged in that were of a paralegal nature and which were strictly within the province of a licensed lawyer. Because the Florida Supreme Court was so conclusive in its decision, this Court will not allow a jury to draw a line between where Neiman's paralegal duties ended and his illegal practice began.

Allowing a jury to draw that fictional line would obfuscate the force of the Florida Supreme Court's decision. While neither the Florida Supreme Court nor the referee enjoined Neiman from engaging in paralegal tasks, neither characterized Neiman's work as that of a paralegal. In fact, both conclusively determined that Neiman was working as an unlicensed lawyer. *Neiman*, 816 So.2d 587, 599 (Fla.2002) ("[W]e agree with the referee that Neiman has improperly engaged in the unlicensed practice of law for profit for years."). Moreover, the Florida Supreme Court is the final arbiter of what constitutes the unlawful practice of law in Florida. Rule 10–7.1(e) of the Rules Regulating the Florida Bar states that: "After review, the [Florida Supreme Court]...shall determine as a matter of law whether the respondent has engaged in the unlicensed practice of law, whether the respondent's activities should be enjoined by appropriate order, whether costs should be awarded, and whether further relief shall be granted." In this case, the determinations have been made by the appropriate body

and this Court has no authority to re-adjudicate that issue by jury trial.

Because the Florida Supreme Court's decision left no room for a finding that Neiman worked as a "paralegal," indeed nothing on this record suggests that he earned income as a paralegal, the issue then is whether Neiman can enforce the policy to recover disability benefits despite his illegal occupation. This Court finds that he is precluded from doing so.

## 2. Enforceability of the Policy

■ Parties to a contract are generally free to contract "out of" or "around" state or federal law, but they may not enter a contract that is void as a matter of public policy. *See King v. Allstate Ins. Co.,* 906 F.2d 1537, 1540 (11th Cir.1990). Public policy empowers this Court to decline enforcement of a contract. *United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 42, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). Public policy is defined as:

> Community common sense and common conscience, extended and applied throughout the state to matters of public morals, health, safety, welfare, and the like; it is that general and well-settled public opinion relating to man's plain, palpable duty to his fellowmen, having due regard to all circumstances of each particular relation and situation.

Black's Law Dictionary 1231 (6th ed.1990). Contracts that are contrary to public policy are void because they have no legal sanction and establish no legal bond between the parties. *United Ass'n of Journeymen & Apprentices v. Henley & Beckwith, Inc.,* 66 So.2d 818, 823 (Fla.1953). To be void as matter of public policy the contract must have a bad tendency or contravene the established interests of society. *Thomas v. Atlantic Coast Line R. Co.,* 201 F.2d 167, 169 (5th Cir.1953). Un-der Florida law, a contract that violates public policy is void and unenforceable. *See Harris v. Gonzalez, M.D.,* 789 So.2d 405, 409 (Fla. 4th DCA 2001). The rationale of the rule is that the judiciary as an institution will not provide aid to enforce an obligation that arises from an illegal contract. *Castro v. Sangles,* 637 So.2d 989, 991 (Fla. 3d DCA 1994). To determine whether a contract violates public policy courts must look to established law, primarily to statutes and secondarily to decisions of the courts. *Id.* at 990 (applying statutory and decisional law to find a contract void as a matter of public policy).

■ Without question, it would be contrary to public policy to enforce a contract indemnifying an assassin who could no longer perform his "occupation." Assuming prostitution is illegal in a particular state, it would violate public policy to enforce an insurance policy providing benefits to a prostitute who can no longer ply her trade. Likewise, enforcement of the policy here would validate a condition of coverage founded in illegality. The premise for furnishing coverage—Neiman's inability to function as an unlicensed lawyer— is founded in criminal conduct expressly prohibited by statute. *See* § 454.23, Fla. Stat. Neiman not only practiced law without a license he also did so unethically, deceiving his clients and pursuing his own avaricious interests. Now he asks this Court to allow him to present claims for disability benefits to compensate him because he can no longer engage in those activities, which he was not legally entitled to be doing in the first place. By allowing such a claim to go forward this Court would legitimize the activity, which the Florida Supreme Court found to be illegal[2] in describing Neiman as a "bogus attorney[ ] seeking to profit from the prob-

---

2. As mentioned, the Florida Supreme Court is the final arbiter of what constitutes the un-lawful practice of law. *See* R. Regulating Fla. Bar 10–7.1(e).

lems of the innocent and uninformed with serious personal and legal problems who may be taken in by a smooth but deceitful demeanor." *Neiman,* 816 So.2d at 599. This is precisely the type of activity prohibited by Florida Statute § 454.23.

It is well-settled that "allowing an insured to benefit from his intentionally injurious conduct is against public policy." *Mass. Mut. Life Ins. Co. v. Millstein,* 129 F.3d 688, 692 (2d Cir.1997). In *Millstein,* the Second Circuit held that it would not allow an insured suffering from a lifelong battle with chemical dependency to recover disability benefits after the state bar caught him stealing client funds and suspended his license. *See also Castro,* 637 So.2d at 990 (holding that contract is contrary to public policy when plaintiff contracted with unlicensed builder); *Goomar v. Centennial Life Ins. Co.,* 855 F.Supp. 319, 324 (S.D.Ca.1994) (enforcing a public policy that rejects recovery of disability benefits relating to an illegal activity); *Mass. Mut. Life Ins. Co. v. Ouellette,* 159 Vt. 187, 617 A.2d 132 (1992) (enforcing public policy to deny claim for disability benefits when legal proceedings against insured caused loss of income). It is plain here that irrespective of Neiman's bipolar II disorder, Neiman should not be indemnified for the loss of income generated from an illegal and injurious occupation. As a matter of public policy, that statutorily-prohibited occupation is not an insurable risk. To rule otherwise would create the incentive for individuals, like Neiman, to insure not merely against the possibility of becoming physically disabled but in effect against the possibility of getting caught.

Relying on *Weissman v. First UNUM Life Ins. Co.,* 44 F.Supp.2d 512 (S.D.N.Y. 1999), Neiman advances the argument that the insurance contract cannot be void as a matter of public policy. In that case, Mr. Weissman's employer was indicted for fraudulent activities. Though not indicted,

Mr. Weissman, who suffered from a brain injury, was investigated by the Securities and Exchange Commission. The SEC's consent order, issued after Mr. Weissman became disabled, permanently barred him from associating with any broker, dealer, investment company, investment advisor, or municipal securities dealer. The order also required him to disgorge $350,000 in illegal profits. In short, Mr. Weissman, though a valid stockbroker, had violated securities laws, while engaged in that occupation. The district court, in *Weissman,* found that because the brain injury caused the loss of income and not the illegal activity, Mr. Weissman was entitled to proceed to trial to claim benefits under a disability policy. It stated:

> The public policy behind voiding any contract provision that indemnifies a wrongdoer from paying the price for his wrongful conduct is to avoid encouraging the wrongful conduct by removing the risk of loss. In that case, the wrongful conduct causes the loss to the wrongdoer. In this case, however, the alleged wrongful conduct did not cause the loss. Plaintiff's injury and resulting brain damage caused the loss. It is absurd to suggest that including coverage for loss of illegal income would encourage anyone, including the plaintiff, intentionally to cause himself brain damage or encourage anyone to commit fraud in order to boost his earnings and thereby increase the benefits he would receive in the remote event of suffering a traumatic brain injury.

44 F.Supp.2d at 520. *Weissman,* however, presents some distinguishing characteristics from this case. The key distinction is Mr. Weissman was lawfully working as a stockbroker, while Neiman was *not* working lawfully as a lawyer. *See Grayboyes v. Gen. Am. Life Ins. Co.,* 1995 WL 156040, *7 (E.D.Pa. April 4, 1995) ("There is a difference between one who is unable to

engage in an occupation and one who is not allowed to do so."). To the extent Mr. Weissman's income was determined to be derived from illegal activity, he should not recover disability benefits to indemnify him for that loss. Likewise, because all of Neiman's income was derived from the unlawful practice of law in the seven years preceding his claim then he should not recover for that loss.[3] As a matter of public policy, this Court will not enforce a disability benefits policy that compensates Neiman for loss of income he was not legally entitled to earn.

Another distinction is that the onset of Mr. Weissman's physical disability occurred before the SEC action commenced. Following this rationale, there are a line of cases that hold a subsequent legal disability, such as a criminal adjudication, is irrelevant to whether an insured is entitled to benefits following the onset of a physical disability. These cases focus on the element of causation; what caused the loss of income. In particular, Neiman relies on *P. Gary Stern, M.D. v. Paul Revere Life Insurance Company*, 744 So.2d 1084 (Fla. 4th DCA 1999), *cert. denied* 762 So.2d 917 (Fla.2000), which held that an insured could proceed to trial to recover disability benefits when the onset of the physical disability began before the criminal proceedings. Likewise in *BLH v. The Northwestern Mutual Life Insurance Company*, 92 F.Supp.2d 910 (D.Minn.2000), the court found an issue of fact on what caused the loss of income—the depression that preceded the criminal proceedings or the criminal proceedings themselves. *See also Ohio Nat'l Life Assurance Corp. v. Crampton*, 822 F.Supp. 1230 (E.D.Va.1993) (finding legal disability that arose after physical disability is not a bar to collecting

benefits). Unlike in *Weissman, Paul Revere* and *BLH*, however, the record reveals the onset of Neiman's bipolar II disorder occurred during the Bar proceedings and criminal proceedings. And again, like in *Weissman*, the key difference that distinguishes *Paul Revere* and *BLH* from this case is that Neiman was unlawfully working as a lawyer, while the insureds in *Paul Revere* and *BLH* were lawfully working as an insurance broker and a physician respectively and during the course of performing those lawful occupations they committed crimes. This key distinction makes a difference when determining whether the contract is void as violative of public policy. In those cases, the lawful occupation was an insurable risk. Neiman's unlawful occupation, like the assassin or the prostitute, is not because it is statutorily-prohibited and criminal. Accordingly, the Court declines to enforce this contract, finding it void as a matter of public policy from the date which the Florida Supreme Court determined Neiman began working illegally as a lawyer.

### 3. The Remedy

■■■■ Having found the insurance contract void as a matter of public policy, the Court must decide whether there are any additional remedies to impose. Courts will generally leave parties that are *in pari delicto* where they place themselves when ruling a contract unenforceable as a matter of public policy. *Harris*, 789 So.2d at 409. *In pari delicto* means that the parties are equally at fault. A plaintiff may recover on an illegal contract only if he has not been guilty of wrongdoing or is not *in pari delicto*. *Castro*, 637 So.2d at 991.

---

**3.** Again, nothing on this record shows Neiman obtained income from paralegal work and the Florida Supreme Court did not endeavor to draw the line between what activities were paralegal in nature and which were within the province of the licensed lawyer. Instead, the Florida Supreme Court found Neiman was unlawfully working as a lawyer.

■ The *in pari delicto* doctrine therefore precludes this Court from awarding Neiman the premiums he paid on the void contract, much less the disability benefits. As repeatedly mentioned, Neiman's own wrongdoing caused the contract to be void. Accordingly, Neiman was *in pari delicto,* if not more at fault than the insurance company, in causing the contract to be void and will recover neither benefits nor the premiums he paid. The Court must leave the parties where it found them.

## CONCLUSION

For the reasons stated above, it is

ADJUDGED that Defendant's Motion for Summary Judgment is GRANTED.